Gregory D. RESNOVER, Petitioner,

v.

Linley E. PEARSON, Attorney General, State of Indiana; and Richard Clark, Respondents.

Civ. No. S88–128.

United States District Court, N.D. Indiana, South Bend Division.

Jan. 14, 1991.

Charles A. Asher, South Bend, Ind., for petitioner.

David A. Arthur, Deputy Atty. Gen., Indianapolis, Ind., for respondents.

# MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

In the early morning hours of December 11, 1980, now a decade ago, Indianapolis Police Sergeant Jack Ohrberg was killed in a shootout at 3544 North Oxford Street in that city. On December 12, 1980, the prosecuting attorney for Marion County, Indiana filed an information charging Gregory Resnover and Tommie Smith with one count of murder and one count of conspiracy to commit murder and requested the death penalty. The charges were filed and heard in the Marion County Superior Court Criminal Division at Indianapolis, Indiana, and the trial which was conducted before the Honorable Jeffrey Boles as Special Judge occurred between June 24 and June 30, 1981, resulting in a conviction of both defendants and the imposition of the death penalty. Gregory Resnover was represented at trial by court-appointed counsel Thomas Alsip.

A direct appeal was taken to the Supreme Court of Indiana which unanimously affirmed the aforesaid conviction and sentence in *Resnover v. State*, 460 N.E.2d 922 (Ind.), *cert. denied*, 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984), in an opinion authored by Justice Pivarnik. In a direct appeal, Gregory Resnover was represented by court-appointed counsel, Dawn D. Duffy of the law firm of Buck, Barry, Landau, Breunig and Quinn in Indianapolis, Indiana. In that appeal, and on the appeal from denial of the first post-conviction relief petition, the Supreme Court of Indiana was unanimous. In the third appeal dealing with the second petition for post-conviction relief, Justice DeBruler dissented and it is necessary to pause a moment to consider the dimensions of his dissent. In the subject matter of that case was the alleged ineffective assistance of counsel Paul Levy in the post-conviction proceeding.

On October 10, 1984, this petitioner, appearing by counsel, Paul Levy, a deputy public defender of the State of Indiana, filed a petition in the Marion Superior Court Criminal Division for post-conviction relief. That proceeding was heard by the Honorable John W. Tranberg who denied

the aforesaid petition on July 19, 1985. An appeal was taken to the Supreme Court of Indiana, which upheld the denial of post-conviction relief in a unanimous opinion authored by Justice Given reported as *Resnover v. State*, 507 N.E.2d 1382 (Ind. 1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 779 (1988) (Justices Brennan and Marshall dissenting on the basis of their dissention in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

On March 2, 1988, Gregory Resnover filed a second post-conviction relief petition in the Marion Superior Court, Criminal Division, in which he was represented by counsel Brent Westerfield of Indianapolis, Indiana. On October 31, 1988, the second petition was dismissed by the state trial judge without a hearing. A direct appeal was taken to the Supreme Court of Indiana, which, in an opinion by Justice Pivarnik, upheld the state trial judge's dismissal in *Resnover v. State*, 547 N.E.2d 814 (Ind.1989), *cert. denied*, — U.S. ——, 111 S.Ct. 216, 112 L.Ed.2d 175 (1990) (Justice Marshall dissenting on the *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) basis).

On May 2, 1988, the petitioner, Gregory D. Resnover, filed the within petition seeking relief under 28 U.S.C. § 2254. That petition was filed on his behalf by Attorney Thomas Anthony Durkin of Chicago, Illinois, an attorney with long, in-depth experience in the criminal justice system in general, and in death penalty litigation in particular. It should be noted that on February 12, 1990, Attorney Durkin filed an amended habeas corpus petition for this petitioner seeking relief under 28 U.S.C. § 2254.

The basic facts as found by the Supreme Court of Indiana in 460 N.E.2d at 926, are as follows:

> The evidence adduced during trial showed that at approximately 3:00 a.m. on December 11, 1980, Indianapolis Police Sergeant Jack Ohrberg met Sergeant Lewis J. Christ to serve papers on certain individuals believed to be at 3544 North Oxford Street in Indianapolis.

Sergeant Ohrberg and Christ subsequently were joined by other officers before arriving at the duplex residence at 3544 North Oxford at approximately 5:30 a.m. With Officers Schneider and Harvey standing watch in the rear, Ohrberg, Christ and Officers Ferguson and Foreman proceeded to the porch and front door. Foreman and Ferguson were in uniform. Ohrberg knocked loudly several times and identified himself as a police officer. He then went to 3546 North Oxford, the adjacent other half of the double residence, and checked with Sandra Richardson to ascertain whether any persons were known to be inside the 3544 address. Richardson told Ohrberg that she had heard noise from 3544. Ohrberg returned to 3544 and again pounded on the front door and announced himself as a police officer. Ohrberg then assumed a crouched position and started to use his right shoulder to batter the door which, after a few hits, began to open. Ohrberg continued to hit the door placing his body partially inside the door. Foreman was shining a flashlight over Ohrberg's head since it was dark inside the residence and Foreman wondered why the front door would not fully open. Looking inside the house, Foreman saw some furniture blocking the door. Sergeant Christ also saw the furniture. As Foreman looked inside, he suddenly saw a burst of muzzle flashes and heard two, possibly three, shots in quick succession. The simultaneous muzzle blasts came from two separate locations approximately eight to ten feet apart. Christ also heard shots emanate from inside the residence. Ohrberg said: "Oh no, I've been shot" or "I've been hit" and then stepped back two steps, sank to his knees and collapsed on the porch. Taking cover, Christ saw a person with an "Afro" type hairstyle emerge from the dark doorway onto the porch and fire at least two additional shots into Sergeant Ohrberg. Shots also were being rapidly fired from within the residence. When Christ returned the gunfire, the man on the porch quickly retreated inside the building. Ferguson also saw the person stand over

**1378**

Ohrberg and fire his rifle into Ohrberg. Ferguson specifically testified that he could see the muzzle flash as the rifle was fired. Ferguson fired at the gunman and then ran around the corner of the house where gunfire continued to be directed at him. After more shooting, a man identifying himself as "Gregory" called from inside the house and said "Let's talk." "Gregory" stated that there was an injured man inside and offered to send out the two women occupants. Christ refused to accept the women and ordered "Gregory" outside. "Gregory" then said that he would come out whereupon he stepped to the door, threw a weapon out into the front yard and walked onto the front porch with his hands raised. Christ identified this man as Appellant Gregory Resnover and identified an AR–15 rifle as similar to the weapon Appellant threw into the front yard. Ferguson also identified the man as Gregory Resnover. Earl Resnover subsequently followed appellant out onto the front porch where he laid down an AR–15 rifle and a Smith and Wesson revolver. Two women lastly walked out of the house leaving wounded Tommy Smith alone in the building. Foreman testified that the four came out of the house approximately ten to fifteen minutes after the initial burst of gunfire.

Forensic pathologist Dr. James A. Benz performed an autopsy on the body of Jack Ohrberg. Benz testified that Ohrberg died as a result of multiple gunshot wounds. He specifically testified that one bullet perforated Ohrberg's abdominal wall and external iliac artery and completely severed his iliac vein. Another shot lodged in the soft tissues of Ohrberg's back after fracturing parts of two vertebrae. A third shot entered his left side, fractured his tenth rib and bruised his lung. There were 600 milliliters of blood in Ohrberg's abdominal cavity.

The weapons thrown into the front yard or left on the front porch were collected by Russell Bartholomew, a crime lab technician. Bartholomew testified that the weapon thrown down by

Appellant was an AR–15 automatic rifle with live rounds. The weapons on the porch were another loaded AR–15 and a loaded .38 caliber Smith and Wesson revolver. Evidence technician Cosmos Raimondi recovered weapons, ammunition clips, bullets and shell fragments from inside the house after it was secured by police. Raimondi testified that he found:

—one AR–15 rifle without clip but with one live round chambered; the rifle's clip was located nearby damaged but containing twenty-five live rounds;

—one .30 caliber Universal carbine with one round chambered and a clip containing twenty-five rounds;

—one rifle clip concealed in a bathroom light fixture;

—one Mauser 7.65 automatic pistol recovered from underneath the front room sofa with one round chambered and one five round clip;

—fifteen spent shell casings recovered from the front room and kitchen;

—twelve live Smith and Wesson rounds for a .38 caliber Special pistol;

—one .223 ammunition clip with twenty-five live bullets discovered hidden underneath the front sofa;

—one ammunition pouch with seven live automatic bullets found underneath a cushion on the front sofa;

—fifteen Smith and Wesson Specials and one WW .38 Special found lying loose on a coffee table;

—one Memorex casette (sic) box with fifteen live .38 caliber bullets;

—one AR–15 clip with thirty live .223 caliber bullets discovered in the rear bedroom; and

—one black shaving case containing one knife, one empty Colt AR–15 clip, one ammunition clip possibly for a M–1 carbine and two hearing protectors.

The AR–15 recovered from the front porch bore Appellant's fingerprints on the ammunition clip. Although this gun had fired eight of the recovered shell casings, it did not fire the bullet recovered from Ohrberg's body. The AR–15 found inside the house with its broken

clip located nearby fired the bullet retrieved from Ohrberg's body. The broken clip appeared to have been dented by a bullet.

Crime lab technician Robert McCurdy testified that he performed atomic absorption tests on swabbings taken from the arms of Appellant and Tommy Smith. Appellant's right arm had significantly higher amounts of barium and antimony, components of modern ammunition primer, indicating his handling or firing of a gun. The tests conducted on the swabbings taken from Appellant's left arm were inconclusive. McCurdy also recovered from Earl Resnover a billfold containing Sergeant Ohrberg's business card.

In the hearing and oral argument held in this case in Lafayette, Indiana, on November 8, 1990, Mr. David A. Arthur as Deputy Attorney General representing the respondents, drew the court's attention to a single sentence in the aforesaid factual statement of the Supreme Court of Indiana. That statement is: "Taking cover, Christ saw a person with an 'Afro' type hairstyle emerge from the dark doorway onto the porch and fire at least two additional shots into Sergeant Ohrberg." Deputy Attorney General Arthur specifically conceded that this petitioner was not the person who came out onto the porch and fired more shots into the body of Officer Ohrberg. Deputy Arthur said that the record discloses that such was done by Tommie Smith, and this court agrees. This court may accept the statements of fact found by the Supreme Court of Indiana to be correct under Title 28 U.S.C. § 2254(d), and under the appropriate authorities. This court finds that petitioner has suffered no prejudice from the Supreme Court of Indiana's findings of fact.

Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), stated:

A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. See 28 U.S.C. § 2254(b), (d). What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791. The Supreme Court in *Jackson* held:

We hold that in a challenge to a conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof beyond a reasonable doubt.

*Id.* (footnote omitted). *See also Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Dooley v. Duckworth,* 832 F.2d 445 (7th Cir.1987), *cert. denied,* 485 U.S. 967, 108 S.Ct. 1239, 99 L.Ed.2d 438 (1988); *United States ex rel. Haywood v. O'Leary,* 827 F.2d 52 (7th Cir.1987); *Bryan v. Warden, Indiana State Reformatory,* 820 F.2d 217 (7th Cir.1987), *cert. denied,* 484 U.S. 867, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987); *Shepard v. Lane,* 818 F.2d 615 (7th Cir.), *cert. denied,* 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987); and *Perri v. Director, Department of Corrections,* 817 F.2d 448 (7th Cir.), *cert. denied,* 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987).

A review of the record in the light most favorable to the prosecution convinces this court that a rational trier of fact could

readily have found the petitioner guilty beyond a reasonable doubt of murder.

In the amended habeas petition filed February 12, 1990, Attorney Durkin on behalf of the petitioner divided his claims into four major categories with numerous subparts of each. Using his labeling system those four are as follows:

I. Petitioner was denied his sixth amendment right to effective assistance of counsel by the cumulative effect of the acts and omissions of trial counsel, which can be demonstrated to be in large part, the direct result of substantial institutional defects within the Marion County Superior Court's systematic provision of representation for indigent capital defendants.

II. The cumulative effect of numerous errors during the trial and pre-trial stages of the proceedings have resulted in a conviction which cannot withstand scrutiny insuring that the jury reached a fair and just result consistent with inherent federal principles of due process and equal protection and petitioner's sixth amendment right of effective assistance of counsel.

III. The sentencing phase of the trial and the sentence of death, as it has been applied to petitioner, based upon substantial cumulative errors and defects in the sentencing phase of the trial violates the eighth amendment's prohibition against cruel and unusual punishment, petitioner's fifth amendment rights against self-incrimination, sixth amendment guarantee of effective assistance of counsel and right of confrontation and the fourteenth amendment due process of laws which prevented the jury from exercising guided discretion and led to the arbitrary and capricious infliction of the sentence on (sic) death on petitioner.

IV. Despite the Supreme Court of Indiana's assertions to the contrary in its direct appeal opinion (*Resnover v. State*, 460 N.E.2d 922, 930 (1984)), in its first post-conviction opinion (*Resnover v. State*, 507 N.E.2d 1382, *cert. denied*, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 779 (1988) and in its second post-conviction opinion 547 N.E.2d 814 (1989)) the inef-

fective assistance of petitioner's appellate and post-conviction counsel in failing to marshal and advance significant evidence indicating that petitioner did not intend to kill, *and in fact did not kill,* has resulted in the death sentence being applied to petitioner in a freakish and capricious manner, contrary to the eighth amendment and violative of inherent federal principals of fundamental fairness and due process of laws.

In the second appeal to the Supreme Court of Indiana and the first post-conviction appeal, the issue of ineffective assistance of counsel, including both trial and appellate counsel invoking *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was presented and dealt with along with issues regarding the denial of a privilege against self-incrimination, request to reopen post-conviction proceedings and the bias and prejudice of the sentencing trial judge. All of these issues were explicated in 507 N.E.2d 1382, and following.

In *United States v. Grizales,* 859 F.2d 442, 447 (7th Cir.1988), Judge Eschbach, speaking for the court stated:

> The Supreme Court has instructed that in evaluating the performance of a trial attorney we are to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2054. Appellant "has a heavy burden in proving a claim of ineffectiveness of counsel." *Jarrett v. United States,* 822 F.2d 1438, 1441 (7th Cir.1987) (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064). The Supreme Court has further cautioned appellate courts to resist the temptation to "second-guess" the actions of trial counsel after conviction. *Id.* It is clear that the performance of trial counsel should not be deemed constitutionally deficient merely because of a tactical decision made at trial that in hindsight appears not to have been the wisest choice. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at

2065; *United States v. Kennedy,* 797 F.2d 540, 543 (7th Cir.1986). *See also United States v. Adamo,* 882 F.2d 1218 (7th Cir.1989).

In the third appeal to the Supreme Court of Indiana, the issue revolved around the dismissal of the second petition for post-conviction relief without an evidentiary hearing.

■ One possible issue in this case should be laid aside at the very outset. To the extent that this petitioner is in any way attempting here to challenge the effectiveness under the Sixth Amendment of the Constitution of the United States, of any of his counsel in post-conviction relief proceedings or collateral proceedings, such has been explicitly foreclosed by the Supreme Court of the United States in *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). In this specific regard, *Finley* directly relates to Justice De-Bruler's dissent at 547 N.E.2d 814, the *only* dissent of *any* of the three trips this case made to the Supreme Court of Indiana. Justice DeBruler's objections are there founded on his reading of the Indiana Post–Conviction rules. Given *Finley,* those concerns are not based on the Sixth Amendment of the Constitution of the United States.

■ It is correct that trial defense counsel Thomas Alsip's effectiveness under the Sixth Amendment as interpreted in *Strickland,* 466 U.S. at 668, 104 S.Ct. at 2052, is at issue here. A substantial effort has been made to establish that appellate counsel, Dawn D. Duffy, was ineffective under *Evitts,* 469 U.S. at 387, 105 S.Ct. at 830, for that reason. This court has examined the brief filed by appellate counsel Duffy in the first appeal and is aware that the decision of the Supreme Court of Indiana in that regard covers 14 pages of the official reports. There is no basis here to disturb that decision of Indiana's highest court.

In any event, the issue as to the effectiveness of Attorney Alsip was fully explored before Judge John W. Tranberg in the first post-conviction proceeding and that Judge, after hearing the evidence made elaborate findings of fact in regard thereto. Elaborate evidentiary proceedings were had before Judge Tranberg in the Marion Superior Court Criminal Division One on March 29, 1985, at which time extensive testimony of defense counsel Thomas Alsip was heard. This court has made an independent examination of that testimony which covers pages 26–58 of the transcript.

Understanding this court's obligation under *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), to make an independent examination of the record in this regard, the testimony of defense counsel Alsip can be best summarized as follows.

Attorney Alsip served as a staff public defender in Marion County from the spring of 1975 until his appointment as a criminal court judge in 1982. At the time of his assignment as Gregory Resnover's defense counsel, Mr. Alsip's death penalty case expertise had come from his trying two capital cases, attendance at several seminars, and study of written materials on the subject. In the course of his defending Gregory Resnover, Mr. Alsip occasionally consulted with the co-defendant's attorney, Mr. Plath. He also received some "paper help" from Professor Kenneth Stroud of the Indiana University School of Law in Indianapolis, Indiana.

Mr. Alsip's investigation of the Resnover case included two trips to the crime scene. He had no recollection (in 1985) of interviewing Samara Palmer or Earl Resnover as possible witnesses. Neither did he recall interviewing any firearms or ballistics experts, though he did call a gun dealer to testify regarding AR–15's specifically.

Attorney Alsip did not follow Gregory Resnover's suggestions for an extensive examination of firearms because he did not believe that the State contended that Resnover fired the fatal bullet.

Distancing defendant Resnover from co-defendant Smith remained Alsip's defense strategy throughout the trial and the penalty hearing. Resnover refused to cooperate with this tactic and instead served to follow co-defendant Smith's lead for every

decision. This was particularly unwise at the penalty hearing, in Alsip's view, because Alsip's defense strategy called for Resnover to present himself to the jury as contrite, humble, a victim of circumstance. Resnover's absence from the penalty hearing totally defeated this plan, which Alsip recalled discussing beforehand with Resnover.

In sum, Resnover chose to walk in lock step with Tommie Smith over the strong and specific protestations of his experienced defense counsel. That counsel's efforts to overrule him on this strategy do not come close to violating the Sixth Amendment values implicit in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This petitioner made the tactical choice to act in concert with Tommie Smith in a so-called "cop killing" case and cannot now use the Sixth or Fourteenth Amendments to gainsay that choice.

It should also be noted that Samara Palmer was called as a witness before Judge Tranberg and invoked the privilege against self-incrimination under the Fifth Amendment of the Constitution of the United States. At that hearing, she was represented by counsel. This court notes that the process in which Samara Palmer exercised her Fifth Amendment rights extended from page 58 to 105 of the transcript for the proceeding held on March 29, 1985.

This court has also independently examined the testimony of the petitioner Resnover from pages 106 through 171 of the written transcript for that day, and also has examined the testimony which followed and was given by the father of the petitioner, Beverly Resnover. Following this hearing, on July 19, 1985, the Honorable John W. Tranberg entered the following findings of fact and conclusions of law:

1. That Petitioner Gregory Resnover was charged in Marion Superior Court, Criminal Division One, with the crime of Murder and Conspiracy to Commit Murder.

2. In a separate information the State requested the penalty of death alleging the aggravating circumstance that the killing was of a law enforcement officer, and that at the time of the killing, the officer was acting in the course of his duty as a law enforcement officer.

3. That two co-defendants were charged along with the Petitioner Gregory Resnover.

4. That the case was severed as to the co-defendant Earl Resnover and was subsequently dismissed as to him.

5. That the Petitioner was represented by Court appointed attorney Thomas Alsip and the co-defendant Tommie J. Smith was represented by Court appointed attorney Richard Plath.

6. That a joint trial was had as to the defendants Gregory Resnover and Tommie J. Smith.

7. That Petitioner and the co-defendant Tommie J. Smith were found guilty as charged on the charges of Murder and Conspiracy to Commit Murder.

8. That in a separate proceeding and hearing the jury recommended the penalty of death.

9. That at a sentencing hearing conducted by special Judge Jeffrey Boles, the Court imposed the penalty of death as to both of the co-defendants, Tommie J. Smith and Gregory Resnover.

10. That the co-defendants did not personally participate in the hearing on the death penalty phase of the trial before the jury and were constantly advised as to their rights as to their presence in the courtroom by the trial judge. Such advisements were individual as to each defendant.

11. That the jury was instructed that the State must prove that the defendants knew the victim was a police officer acting in the course of his duty.

12. That Petitioner's attorney interviewed witnesses, participated in depositions, and called witnesses on behalf of the Petitioner Gregory Resnover.

13. That Petitioner's attorney filed a Motion to Dismiss and participated in numerous pre trial hearings.

14. That as to crucial witnesses whose testimony related to petitioner's knowledge and culpability the defense counsel

sought to suppress, object or impeach such testimony.

15. That there was no showing of any particularized need for separate experts or investigators.

16. That Samara Palmer was not called as a witness by the defense counsel and that it is speculative as to whether she would testify if called or the weight of the testimony.

17. That the Defendant–Petitioner Resnover did not testify or participate in the penalty phase of the trial although defense counsel expected him to and urged him to testify.

18. That other witnesses, such as Steven Judy's attorney, were not called by defense counsel, nor were others who defendant and his family desired who could not have given admissible testimony.

19. That there is no showing that there was not individualized consideration by the jury and Court as to Gregory Resnover's culpability.

20. That appellate counsel did not point out certain misstatements in the State of Indiana's brief.

21. That Appellant's Brief fairly presented the issues and the issues were considered and decided upon appeal.

22. That the comments of defense trial counsel were not adverse to his client and there was no conflict in such representation.

23. That the strategy and tactics of the trial defense counsel were reasonable and professional in the light of all the circumstances of this case.

24. That the final arguments of the Prosecuting Attorney were not such as to minimize the importance of the jury participation as to voice any personal opinions of the prosecutor based upon any matters not in evidence and were not improper.

25. That the jury was not instructed by the Court as to the defendant's absence in the penalty phase.

26. That the comments of defense counsel and Prosecuting Attorney were not improper under the circumstances.

27. That the instructions given were proper and comprehensive.

28. That the prospective jurors were not improperly excluded.

## CONCLUSIONS OF LAW

1. That the statute of the State of Indiana defining the aggravating circumstance of the killing of a police officer in the line of duty as exected (sic), construed and applied, is not unconstitutional.

2. That defense trial counsel Thomas Alsip was not incompetent and ineffective under the law and his services were performed in a professional and reasonable manner.

3. That defense appellate counsel was not incompetent and ineffective and there was a fair consideration of all of the issues.

4. That the comments of the Prosecutor in final argument were not improper.

5. That the procedures and trial were fair and Gregory Resnover did receive individual consideration as to his culpability and the appropriateness of the penalty of death, and his own refusal to follow the advice of his attorney at the jury penalty phase was the only factor which made further individual consideration impossible.

6. That the jurors were not improperly excluded.

Based upon such Findings of Fact and Conclusions of Law the Court now finds against the Petitioner and for the State of Indiana and it is the Judgment of the Court that Petitioner take nothing by way of his Petition.

■ Both *Strickland* and *Evitts* require not only unprofessional conduct on the part of counsel, but also require some actual prejudice springing therefrom. Whatever deficiencies appellate counsel may have experienced, there is no indication that any of those failings had anything to do with an adverse decision against the petitioner. Specifically, her failure to raise on direct appeal the issue of Mr. Alsip's ineffectiveness is more than obviated by the fact that

such was in fact raised in an elaborate procedure and dealt with extensively by the Supreme Court of Indiana. Therefore, there is no ineffectiveness as to the performance of counsel on the first direct appeal.

More needs to be said with regard to the task that was assigned to Mr. Alsip to defend this most difficult case. It must be first of all noted that Mr. Alsip brought to the task of representing Gregory Resnover in June, 1981, a considerable relevant experience as a criminal defense lawyer. Reported decisions of the Court of Appeals and Supreme Court of Indiana would reflect at least a decade of in-depth experience in criminal as well as civil litigation. For example, see *Pavach v. State*, 149 Ind. App. 293, 271 N.E.2d 896 (1971); *Buchanan v. State*, 258 Ind. 112, 279 N.E.2d 576 (1972); *Pope v. Marion County Sheriff's Merit Board*, 157 Ind.App. 636, 301 N.E.2d 386 (1973); and *Revord v. Russell*, 401 N.E.2d 763 (Ind.App.1980). Mr. Alsip's early success before the highest court of Indiana in 1972 in *Buchanan*, 279 N.E.2d at 576, in an opinion authored by then Chief Justice Arterburn, is of no small moment. Defense counsel had also been involved as appointed defense counsel in a death penalty case tried in late 1980, *Burris v. State*, 558 N.E.2d 1067 (Ind.1990). *Compare Daniels v. State*, 561 N.E.2d 487 (Ind.1990).

The task of representing any defendant charged with a criminal offense is a most difficult one and often involves delicate strategic as well as ethical choices. *See Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). Certainly, this defense counsel might well have incurred the wrath of the presiding trial judge had he attempted to put a witness on the stand, knowing that she was going to claim the privilege against self-incrimination under the Fifth Amendment of the Constitution of the United States. It is hard to see how such a misguided effort would have benefited this petitioner.

This court is in agreement with Judge Tranberg and apparently all of the justices of the Supreme Court of Indiana as late as 1987, that as difficult and as complex as this case is, and has become, defense counsel Alsip met the standards of the Sixth Amendment in representing Gregory Resnover.

In this regard, it is necessary and desirable to remember some relevant history. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 was decided in 1972 and in effect threw judicial cold water on all death penalty prosecutions in Indiana and throughout the nation. Four years later in *Gregg v. Georgia*, 428 U.S. at 153, 96 S.Ct. at 2909, the Supreme Court of the United States did a turn-around and established new and different Eighth Amendment standards by which death penalty statutes in the various states were to be examined.

As indicated in this case and many others, it is by the standards of *Gregg* and its progeny that death penalty statutes must now be examined. This ground was traversed fully and carefully in this case in Part I of Justice Pivarnik's opinion from pages 928 to 930. The plain historic fact is that there was a considerable slice of time in the mid–1970's in Indiana and elsewhere when *no* defense counsel had any opportunities for experience in the defense of criminal charges in which the death penalty is requested. Indiana's basic death penalty statute was enacted in 1977, amended in 1983, 1986, 1989, and 1990. *See* I.C. § 35–50–2–9.

■ Before dealing with some remaining issues that must have been exhausted by reference to state remedies, it is necessary to deal specifically with the concept of procedural default as it impacts on a great number of the issues that purport to be presented in this proceeding. This court is well aware of the requirement found in *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), which holds that "procedural default does not bar our consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a procedural bar."

In *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), Justice O'Connor stated:

> "The rule announced in *Harris v. Reed* assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding. It is simply inapplicable in a case such as this one where the claim was *never* presented to the state courts." (emphasis added)

*Id.* 109 S.Ct. at 1068.

It does not appear that the other concurring judges in *Teague* are at odds with the above quoted statement by Justice O'Connor. Their focus was primarily on the problem of retroactivity of the rule established in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Therefore, it seems clear that when *Teague,* 489 U.S. at 288, 109 S.Ct. at 1060, and *Harris,* 489 U.S. 255, 109 S.Ct. 1038, are considered in tandem that issues which were *never* raised in the state courts are the proper subject of procedural default in this collateral review under § 2254. Were it to be otherwise, there could never be an end to this kind of collateral review. If a defendant convicted in a state court proceeding could file continuous assertions of issues and claims not previously raised in the state courts, and then claim the benefits of *Harris,* it would be very difficult if not impossible, to ever bring a § 2254 proceeding to an end. Certainly, this is a subject that has caught the attention of a special committee chaired by retired Justice Lewis F. Powell and a legislative solution to this kind of problem is pending in the Congress of the United States. However, under *existing* law, it appears that issues which have not been raised at all in the state courts can and should be procedurally defaulted under the above analysis of *Harris v. Reed,* and *Teague v. Lane.* Most recently in *Willis v. Cohn,* 747 F.Supp. 1305 (S.D.Ind.1990), Judge McKinney carefully delineated the teachings of *Harris* and *Teague* and their progeny.

■ The court will now proceed to a consideration of a number of the kinds of issues that have not been raised in any fashion in the state court. There is a contention here that trial defense counsel failed to file a severance motion and a bill of particulars motion. Such was never raised as an issue in the state courts. It is further asserted that defense counsel failed to file a motion for change of venue. That issue was never raised in the state courts. It is further asserted that defense counsel coerced the petitioner into withdrawing his *pro se* motion for change of judge and objections to change of venue; this also was never presented to the state courts.

It is correct that on the direct appeal in 1984, an issue was raised with regard to pretrial publicity but the same was not framed there as it is here as an argument for ineffective assistance of trial counsel. In any event, there is no showing here that the due process values of *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) have been violated.

■ Petitioner claims ineffective assistance of counsel because, petitioner claims, Attorney Alsip virtually conceded the death penalty hearing. The petitioner refused to appear at the required bifurcated proceedings before the jury in regard to the death penalty phase. The record discloses that the presiding trial judge expressed concern if not consternation at this development. This petitioner literally left his appointed counsel high and dry in this regard. Appointed counsel was required to go before the jury that had just found this defendant and his compatriot guilty of murder and conspiracy and was professionally obligated to make some kind of enfeebled explanation as to his absence. The blunt and obvious fact was that Gregory D. Resnover was not personally present before that jury considering the death penalty at that time. He was not present because he voluntarily chose not to be present. Certainly, Clarence Darrow, Edward Bennett Williams or F. Lee Bailey might have each thought of something creative to say at that time and under those circumstances, but the blunt and obvious fact was that Resnover wasn't

there. He now retroactively expects his appointed defense counsel to have performed some kind of a miracle of advocacy on his behalf. Given the almost totally no-win situation created by Resnover's own conduct, it is very difficult with the omniscience of hindsight to fault defense counsel Alsip for his efforts during that presentation.

In some very sensational cases in which the death penalty has been sought, defense counsel will concentrate on avoiding the application of the death penalty and in the process will often basically concede the commission of the crime itself. Certainly, Clarence Darrow used that precise tactic with great success in defending Nathan Leopold and Richard Loeb in 1924. This petitioner strongly resisted the understandable tactics of defense counsel Alsip to attempt to distance Resnover from Tommie Smith. It was Resnover and not Alsip who chose to walk in lock step with Tommie Smith. After all, in the final analysis, a defense counsel, even a very good and experienced one, is required to follow the expressed decisions of his client, even when these decisions after the fact lead to disaster. Given this tactic of cooperation rather than distancing, it is hard to conceive what brilliant tactical moves could have been made by counsel Alsip that would have brought about a different result. Nathan Leopold and Richard Loeb cooperated with Clarence Darrow and did not leave him in the lurch at the critical moment of the trial. Resnover did otherwise and now complains that his counsel should have been a latter-day Clarence Darrow. *See* H. Higdon, *The Crime of the Century: The Leopold and Loeb Case* (1975).

This issue was not raised in the state courts and even if it had been, it would not constitute ineffective assistance of counsel under the Sixth Amendment of the constitution of the United States, as defined in *Strickland. See also Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973), *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), *United States ex rel. S.E.C. v. Billingsley*, 766 F.2d 1015 (7th Cir.1985) (proceedings may continue in defendant's absence when defendant has waived his right to be present.).

An effort is here made to put the public defender's system in Marion County, Indiana on trial and such is completely beyond the pale of consideration in this case. The focus must here be on whether the petitioner had constitutionally effective assistance of counsel. This court, as well as the Supreme Court of Indiana, has determined that question in the affirmative.

■ An issue is raised with regard to a series of *pro se* motions which were made by Resnover during the proceedings in the Marion Superior Court Criminal Division. He claims that the state trial court committed error by denying without holding an evidentiary hearing of his *pro se* motion. This issue was never raised in the courts of the State of Indiana and is without merit in any event. Defense trial counsel had adequate time to prepare for the defense of this case. It is further asserted that the state trial court committed error by denying without an evidentiary hearing Resnover's *pro se* motion to hire an independent investigator. Again, this issue was not raised in the state courts and there is no demonstration that the hiring of an investigator could have changed the outcome of this trial.

■ It is further contended that the state trial court committed error by denying without hearing other *pro se* motions. The record discloses that the presiding state judge considered all *pro se* motions filed through counsel and there was no error in refusing to accept or rule upon *pro se* motions not filed through counsel.

Certainly, there is a right to self-representation under *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The record in this case does not indicate at any time that this defendant requested the complete and total right to self-representation. There is no right to hybrid representation, even under *Faretta*, 422 U.S. at 806, 95 S.Ct. at 2525. *See United States v. Trapnell*, 638 F.2d 1016, 1026–1027 (7th Cir.1980).

■ It is contended that the state trial court improperly admitted hearsay statements of a co-conspirator without any prior determination that a conspiracy had existed. At least with regard to the so-called co-conspiracy hearsay rule in the federal court system, the Supreme Court of the United States has been quite lenient in its formulation thereof as reflected in the opinion of Chief Justice Rehnquist in *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). For a recent expansive view of *Bourjaily*, see *United States v. Pallais*, 921 F.2d 684 (7th Cir.1990).

This court remembers with admiration the classic statement of Justice Robert Jackson in regard to the use of a conspiracy charge:

This case illustrates a present drift in the federal law of conspiracy which warrants some further comment because it is characteristic of the long evolution of that elastic, sprawling and pervasive offense. Its history exemplifies the "tendency of a principle to expand itself to the limit of its logic." (quoting Judge Cardozo) The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself, or in addition thereto, suggests that loose practice as to this offense constitutes a serious threat to fairness in our administration of justice.

The modern crime of conspiracy is so vague that it almost defers definition. Despite certain elementary and essential elements, it also, chameleon-like, takes on a special coloration from each of the many independent offenses on which it may be overlaid. It is always "predominantly mental in composition" because it consists primarily of a meeting of minds and an intent.

*Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). In this case, there *was* enough evidence to establish the existence of a conspiracy for purposes of invoking the co-conspiracy hearsay rule and indeed there was an adequate foundation under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), for the jury to find the existence of a criminal conspiracy. In any event, there was no constitutional violation with reference to the admission of co-conspiracy hearsay in the trial of this case.

■ The state trial court is alleged to have committed an error by admitting evidence of other crimes paralleling the provision in regard to that subject in Rule 404(b) in the Federal Rules of Evidence. Again, the Supreme Court of the United States has addressed 404(b) evidence in *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), as follows:

We share petitioner's concern that unduly prejudicial evidence might be introduced under Rule 404(b) (citations omitted). We think, however, that the protection against such unfair prejudice emanates not from a requirement of a preliminary finding by the trial court, but rather from far other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402—as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice, see Advisory Committee's Notes on Fed.Rule Evid. 404(b), 28 U.S.C.App., p. 691, S.Rep. No. 93–1277, at 25; and fourth, from Federal Rule of Evidence 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. *See United States v. Ingraham*, 832 F.2d 229, 235 (CA1 1987).

485 U.S. at 681, 108 S.Ct. at 1496. The record here does not run counter to a most liberal reading of *Huddleston*.

The issue above just described was not raised in the state courts when procedural default applies. Even on the merits, a police officer on direct examination said that police were at Resnover's residence to serve "papers." At a later time in the trial

the term "warrants" was also used. But the charges in the warrants which were robbery and murder were never disclosed to the jury, that found this defendant guilty of murder and conspiracy. The evidence relating to the serving of papers was certainly relevant to prove that these police officers, including the deceased victim, were acting within the scope of their official duties which is a critical element of the death penalty count. Certainly, no error of any constitutional dimension was committed in permitting the jury to know that warrants were being served at the time and place when this police officer was shot and killed.

 It is asserted that the state trial court committed error by refusing to give tendered instruction numbers 1 and 2 which state:

## DEFENDANTS' TENDERED FINAL INSTRUCTION NUMBER ONE

A part of the Statute of the State of Indiana which defines and states the essential elements of the crime of INVOLUNTARY MANSLAUGHTER, a Class C Felony, which may be included under the charge of Murder, with which the defendants are charged in Count One of the Information, reads as follows:

"A person who kills another human being while committing or attempting to commit battery, commits involuntary manslaughter, a Class C Felony."

## DEFENDANTS' TENDERED FINAL INSTRUCTION NUMBER TWO

A part of the Statute of the State of Indiana which defines and states the essential elements of the crime of Criminal Recklessness, a Class D Felony, which may be included under the charge of Murder, with which the defendants are charged in Count One of the Information, reads as follows:

"A person who recklessly, knowingly, or intentionally inflicts serious bodily injury on another person commits criminal recklessness, a Class D felony."

Failure to give these tendered instructions was never argued as error in the state court and therefore is subject to procedural default. In any event, these instructions were not proper as instructions on lesser included offenses for murder under the decision of the Supreme Court in *Swafford v. State*, 421 N.E.2d 596 (Ind.1981).

 It is further asserted that the prosecuting attorney of Marion County, Indiana at the time of these events had a conflict of interest and that he should have recused himself from advancing this prosecution. This springs from the fact that this prosecutor believed that the petitioner was involved in threats against this prosecutor's life. In addition to the fact that this issue has not been presented to the state courts and is procedurally defaulted, it is otherwise without merit.

Unfortunately in the society in which we now live, it is all too commonplace that judges, prosecutors, and lawyers are threatened and their lives are in danger. The same is sometimes true of defense lawyers and lawyers who engage extensively in civil rights practice. Within the decade, two United States district judges have been murdered as has a United States court of appeals judge in Alabama. It is a matter of common knowledge that United States district judges, United States attorneys, state judges and state prosecutors are often threatened and require protection from threats. It was apparently the perception of Prosecutor Goldsmith that he had been targeted by this petitioner and others. This petitioner now argues that because Prosecutor Goldsmith believed that he had been threatened by the petitioner, that the Constitution of the United States was somehow violated when this prosecution was initiated and that the prosecutor should have recused himself. There is not a shred of authority from the Supreme Court of the United States, the Supreme Court of Indiana, the United States Court of Appeals in this circuit to support any such constitutional conclusion. The law is clear that a party, including a defendant in a criminal case, cannot drive a state trial judge off the bench in a case by threatening him or her. It is likewise true

that a criminal defendant cannot cause the recusal of his prosecutor by threatening the prosecutor or having him threatened. It is a great melancholy of modern times, that trial judges, prosecutors and even defense counsel are threatened by criminal defendants. Not very long ago in an appeal from this very court and judge, the Court of Appeals in this circuit excused an appointed lawyer from further participation in the case on the basis that his client, a successful petitioner under § 2254, had threatened him. *See Thomas v. Indiana*, 910 F.2d 1413, 1417 (7th Cir. 1990).

■■■ A closer question is presented in regard to the conduct of the prosecutor in closing arguments, which included the following comments:

> This is a very serious part of this trial, regardless of whether the defendants chose to be here or not. R.2441.

> We have before you today figuratively if not actually two defendants who are guilty of murder and conspiracy to commit murder." R.2442.

> Let's set the stage just a little bit. Here's the death penalty. It's these right here. I won't put out all one hundred bullets. We'll take the bullet-proof vest and put it back here. This is Jack Ohrberg, and that is Jack Ohrberg. Now we've got the stage, right? Wait, we're missing one thing. De-sanitize it. Let's put the defendants back in the courtroom, don't punish them for their actions, but don't reward them for turning their backs on justice. Let's de-sanitize them. R.2480–2481.

> Let's put Greg Resnover and Tommie Smith back in the courtroom. Just so we don't forget who they are. R.2484.

In 1935, Justice George Sutherland, speaking for the Supreme Court of the United States in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) said:

> He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper

methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. 295 U.S. at 88, 55 S.Ct. at 633. No less can be said for the elected prosecutor of a large metropolitan county such as Marion County, Indiana. When the totality of the argument of this prosecutor is laid out and considered in the context of the entire trial, and in the context of the arguments that were made by counsel for this petitioner and his co-defendant, it cannot be said that this prosecutor engaged in unconstitutional foul play. This is not to say that it might have been better left unsaid. As Chief Judge Bauer pointed out in *United States v. Dominguez*, 835 F.2d 694 (7th Cir.1987), with reference to an extravagant argument made by an Assistant United States attorney in this court in a case tried by this Judge, it would have been left better unsaid, but it was not reversible error there and it is not constitutional error here.

■■■ It is also here asserted that there was some kind of constitutional error in the presence of a large number of police officers in the courtroom. Again, this issue was never raised in the state courts; however, on its merits, the Supreme Court of the United States has found no violation in having numerous uniformed officers in the courtroom to provide security. *See Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). Even assuming that all of the police officers referred to were in uniform and not in plain clothes, there is no constitutional error presented in that regard.

■■■ It is further alleged that the state trial court committed error by denying a motion to dismiss statements made by petitioner Resnover to an officer named Hunt. It is asserted that such violated the mandates and inhibitions of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). An evidentiary hearing was held and the state trial court ruled on the motion to suppress. The record discloses that Officer Hunt overheard Resnover talking in the back of the police van after the shooting. Resnover alleged said, "Beautiful shot, blowed him away." This

statement was a voluntary one not made as a result of any custodial interrogation under *Miranda*, 384 U.S. at 436, 86 S.Ct. at 1602, and falls within the ambit of *Rhode Island v. Innes*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Likewise, it is claimed that the state trial court committed error by denying the motion to dismiss the statements made by the petitioner to Gregory Johnson and Scott Miley. Neither Gregory Johnson nor Scott Miley was a police officer. The Supreme Court of Indiana made this finding of fact and such finding of fact is subject to the presumption of correctness under § 2254(d). An independent examination of the record under *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), will support the conclusion that there was no interrogation by a government agent, and therefore, the principles of *Miranda* were not violated. No constitutional error was committed in this regard.

The state trial court is alleged to have committed error by admitting into evidence the hearsay statements of Sergeant Ohrberg by allowing the in-court identification of Resnover and by its comments to the jury about Resnover's in-court identification. This issue was never raised in the state courts and is therefore procedurally defaulted as above described.

It is alleged that defense counsel also was ineffective in failing to call Samara Palmer as a witness. However, as above indicated, Samara Palmer was present at an extensive proceeding before Judge Tranberg, represented by counsel, and continuously and indeed strenuously claimed the Fifth Amendment privilege throughout that proceeding. There are ethical considerations when a lawyer, either on defense or prosecuting, puts a witness on the stand before the jury knowing that that witness will take the Fifth Amendment. *See American Bar Association Standards for Criminal Justice*, Section 4-7.6(c).

There is no question that Mr. Alsip attempted to talk to Samara Palmer. As indicated by Chief Justice Burger in *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), Mr. Alsip is not required to do an unethical act. The post-conviction court held and the Supreme Court of Indiana left standing a decision that Samara Palmer had the Fifth Amendment privilege as to a number of relevant questions. The decision of the State of Indiana to deny immunity to Samara Palmer does not raise a constitutional question. *See Dean v. Duckworth*, 748 F.2d 367, 372 (7th Cir.1984).

An assertion is now made that somehow this petitioner did not knowingly and intelligently waive his right to be present at the penalty phase of his trial. This is borderline absurd when one considers the extensive record that was made in that context and the extensive questioning of the state trial judge on that very subject.

Some quibble is made with regard to the manner in which the state trial judge placed some emphasis on the jury's sentence of death being advisory, but this issue was never presented to the state courts and is subject to procedural default under *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989).

■■■■ It is also argued that the state improperly brought this capital offense charge by way of information rather than by indictment. Once again, an inmate is involved in a misguided attempt to state that the failure to be charged by way of a grand jury indictment under Indiana Code § 35-34-1-1 in some way provides a basis for relief under 28 U.S.C. § 2254. In the most categorical terms, it does not. Article 1, Section 13 of the Indiana Constitution provides only that an accused shall have a copy of the accusation against him. *See also Chatfield v. Richards*, 739 F.Supp. 1262 (N.D.Ind.1990). This court has now repeatedly ruled with regard to the Fifth Amendment of the Constitution of the United States. The Fifth Amendment provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice

put in jeopardy of life or limb, nor shall be compelled in any criminal case to be a witness against himself, nor be deprived or life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation.

It is historically elementary that the provisions of the Fifth Amendment of the Constitution of the United States were originally designed to be applicable only as against the government of the United States and not the individual states. However, in the twentieth century, the Supreme Court of the United States engaged in a far reaching but nevertheless limited incorporation of some but not all of the provisions of the Bill of Rights into the Fourteenth Amendment of the Constitution and to make the same applicable to the states. The right to be indicted by a grand jury for a capital felony crime is not a privilege or immunity protected under Article IV of the original Constitution of the United States, or by the Privileges and Immunities Clause of the Fourteenth Amendment of the Constitution of the United States. Neither does the same deny due process or equal protection under either the Fifth or Fourteenth Amendments of the Constitution of the United States.

This court has repeatedly cited as authority the decision of the Supreme Court in *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), as well as *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), and *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).

The authority of the prosecutor is only to *request* that the death penalty be imposed. The final decision at the trial court level is with the presiding and sentencing judge. Certainly, the prosecutor has "unfettered authority" to charge a person with a capital offense. Such authority is found in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and its progeny.

The death penalty charge was made with appropriate prosecutorial authority and was properly before the court and jury for a decision. In that regard, there was no violation of the Constitution of the United States.

▮ It was asserted that the death penalty should not be imposed upon an aider and abetter and this petitioner claims that he was not the trigger man. In *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the Supreme Court of the United States held that major participation in a felony committed, combined with reckless indifference to human life, is sufficient to satisfy the culpability requirements set forth by that court in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In *Tison*, 481 U.S. at 157, 107 S.Ct. at 1687, Justice O'Connor stated:

> [W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

The factual record here is in line with the reasoning and result in *Tison*. In fact, *Tison* fully supports the imposition of the death penalty. Neither does this case run afoul of the Eighth Amendment mandates of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The last two paragraphs of Justice White's opinion are revealing:

> For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing ore causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts. This is the judgment of most of the legislatures that have recently addressed the matter, and we have no reason to disagree with that judgment for purposes

of construing and applying the Eighth Amendment.

### IV.

Because the Florida Supreme Court affirmed the death penalty in this case in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken, we reverse the judgment upholding the death penalty and remand for further proceedings not inconsistent with this opinion. So ordered.

*Enmund,* 102 S.Ct. at 3378–3379. It must be noted that Justice White joined the majority in *Tison.* The judicial epilogue is found in 160 Ariz. 501, 774 P.2d 805 (1989) which again proves that trial judges are, indeed, the workhorses of the judiciary.

It may never be known on this earth who fired the fatal shot into police Sergeant Jack Ohrberg's body in the early morning hours of December 11, 1980. What is known and is clearly established by the evidence is that this petitioner was an active, willing participant in the killing of this police officer in the line of duty. What is established is that this petitioner fired at Sergeant Ohrberg with the clear intention of killing him. What is established is that the intent to kill became a tragic reality. What is apparent is that this petitioner is every bit as culpable as his confederate, Tommie Smith.

■■■ The state trial court is also alleged to have improperly admitted a tape of the police radio band during the actual shooting. This issue was raised in the state courts and was dealt with by the Supreme Court of Indiana in the direct appeal decision. This issue was raised as a state law issue and this court will indulge a considerable doubt as to whether it was fairly presented as a constitutional issue to the state courts. In any event, the tape was relevant to demonstrate that the police were acting in the performance of their duties which is an aggravating factor in the justification of the decedent. There was no constitutional error committed by the state court with reference to its admis-

sion. The state trial court is also alleged to have improperly admitted inflammatory photographs taken before and after the autopsy of the victim Ohrberg. This issue was not raised in the state courts, but it may be highly relevant. This petitioner maintained throughout the trial that the angle of his fire demonstrated that he did not shoot at Officer Ohrberg. The autopsy and the location and angle of the bullets as disclosed in the photographs were highly relevant to that defense issue. There is no constitutional error with regard to the admission thereof.

■■■ The petitioner raises an issue which needs careful attention. He contends that the state trial court improperly admitted evidence regarding the victim's personal character and the impact upon the victim's family and friends.

The Supreme Court of the United States has ruled that introducing "victim impact statements" at a hearing on the death sentence violates the Eighth Amendment. In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), *reh. denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987), a state statute required the jury to hear about interviews of the victims' family members, in which they described their grief and rage. In *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), *reh. denied,* —— U.S. ——, 110 S.Ct. 24, 106 L.Ed.2d 636 (1989), the victim was a self-proclaimed "reverend minister." During the murder the apparent robbery attempt, the defendant scattered the victim's religious pamphlets on the ground. At trial, the prosecutor read from one of these tracts and commented on the defendant's evident indifference to the victim's piety. The victim's voter registration card was also introduced to show the victim's civil involvement. Each of these situations violates the defendant's Eighth Amendment rights because the evidence was not relevant to the circumstances of the crime.

The Supreme Court's expressed fear that victim impact or victim character evidence is likely to so influence the jury that an

arbitrary sentence of death results. Such evidence can be unrelated to the defendant's blameworthiness, impossible to fairly rebut, and wholly dependent on the family's expressiveness. Finally, the jury could be deciding defendant's fate on facts which the defendant did not know. *Booth*, 107 S.Ct. at 2534, 2535.

In this petitioner's penalty phase, there was no evidence presented as to character of the victim or the impact on his family and friends. The evidence then and there focused on whether Jack Ohrberg was a police officer in the performance of his duties. The evidence leads solely to the conclusion that he was. This evidence was directly relevant to the circumstances of the crime. It was presented not to inflame the jury or win their sympathy, but rather to allow them to decide upon an aggravating factor in sentencing. There was no constitutional error.

 Error is here alleged with reference to Instruction 27 and the verdict forms. That Instruction stated:

If, after a consideration of all the evidence herein, you and each of you are convinced beyond a reasonable doubt that the aggravating circumstance was a law enforcement officer, and that the victim was acting in the course of his duty has been proven to you beyond a reasonable doubt, and that if you are further convinced by the evidence beyond a reasonable doubt, that any mitigating circumstances that existed are outweighed by the foregoing aggravating circumstances, the form of your recommendation may be:

"We, the Jury recommend the defendants, TOMMIE J. SMITH and GREGORY RESNOVER, shall suffer the penalty of death as provided by law."

If, after careful consideration of all the evidence herein, you and each of you entertain a reasonable doubt as to the aggravating circumstance alleged by the State, or if you are convinced that any mitigating circumstances, then the form of your recommendation may be:

"We, the Jury, do not recommend that the defendants TOMMIE J. SMITH and GREGORY RESNOVER, shall suffer the penalty of death."

*Separate* verdicts were entered finding each defendant guilty of the charge in Count II and *separate* recommendations were entered as to each defendant recommending the death penalty. While this issue could be procedural default under the *Harris–Teague* analysis, there is no merit to the claim. The instructions and verdict forms comply with *Tison v. Arizona.*

The defendant challenges the final instructions numbers 23, 25, 27 and 38 in the death penalty phase, and the preliminary instructions 9, 10 and 11, as follows:

#### INSTRUCTION NUMBER 9

In considering the evidence, the Jury may consider all the evidence introduced at the trial state of the proceedings herein, together with any new evidence presented at the sentencing hearing.

#### INSTRUCTION NUMBER 10

The defendants may present any additional evidence relevant to the aggravating circumstances alleged or any of the mitigating circumstances provided by the Statute. The mitigating circumstances that may be considered as follows:

1. The defendant has no significant history of prior criminal conduct.
2. The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder.
3. The victim was a participant in, or consented to, the defendant's conduct.
4. The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor.
5. The defendant acted under the substantial domination of another person.
6. The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.

**1394**

7. Any other circumstances appropriate for consideration.

### PROPOSED FINAL INSTRUCTION NO. 23

A person who knowingly or intentionally aids, induces, or causes another person to commit an offense, commits that offense and is subject to the same penalties as the person he knowingly aided, induced, or caused to commit the offense.

### INSTRUCTION NO. 25

The defendants may present any additional evidence relevant to the aggravating circumstances alleged or any of the mitigating circumstances provided by the Statute. The mitigating circumstances that may be considered are as follows:

1. The defendant has no significant history of prior criminal conduct.
2. The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder.
3. The victim was a participant in, or consented to, the defendants' conduct.
4. The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor.
5. The defendant acted under the substantial domination of another person.
6. The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.
7. Any other circumstances appropriate for consideration.

### INSTRUCTION NO. 28

The Court shall make final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider.

The Court is not bound by the Jury's recommendation.

It is alleged that the state trial court erred by failing to make the requisite finding that Resnover had the requisite knowledge that Ohrberg was a police officer. The decision of the state courts very clearly establish that this petitioner had the requisite knowledge that this victim was a police officer. A careful and full independent examination of the entire record leads to that conclusion.

There is no basis here alleged for granting a writ under 28 U.S.C. § 2254. Petition and writ DENIED. IT IS SO ORDERED.