Perry Steven **MILLER**, Petitioner,

v.

Rondle **ANDERSON**, Superintendent Respondent.

No. 3:99 CV 258 AS.

United States District Court, N.D. Indiana, South Bend Division.

June 19, 2000.

Brent Westerfield, Indianapolis, IN, Eric Koselke, Indianapolis, IN, for petitioner.

Michael A. Hurst, James B. Martin, Indianapolis, IN, for respondent.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

Petitioner, Perry Steven Miller, was convicted of murder in a state court trial conducted in Valparaiso, Indiana, and was sentenced to death by the judge conducting that trial upon the recommendation of the jury that heard the case. The within petition was filed by counsel in this Court on August 17, 1999 and oral argument was heard in Lafayette, Indiana on March 16, 2000. This Court greatly appreciates the high degree of professional competence displayed by appointed counsel for this petitioner.

The extensive state record has been filed and examined by this Court under the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and under the mandates of the Antiterrorism and Effective Death Penalty Act (AEDPA) 28 U.S.C. § 2244(b). Immediate reference is made to the two decisions in this case by the Supreme Court of Indiana, namely *Miller v. State,* 623 N.E.2d 403 (Ind.1993), and *Miller v. State,* 702 N.E.2d 1053 (Ind. 1998), *cert. denied,* 528 U.S. 1083, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000). This petitioner is now confined on death row at the Indiana State Prison in Michigan City, Indiana in this district.

## I. Factual and Procedural Background

Nineteen year-old Christel Helmchen was working alone at the White Hen Pantry in Valparaiso, Indiana in the early morning hours of November 14, 1990 when she was abducted, raped, brutalized, and murdered.[1] Her body was found later that day at a construction site near Highway 6 in Valparaiso. The autopsy showed the cause of death to be a shotgun wound to the head, and further revealed that Helmchen had been sexually assaulted, with severe injuries to her pubic area and anal canal.

On the afternoon of the 14th, Helmchen's checkbook was found in the driveway of 206 Holcomb, LaPorte, Indiana, the residence of Miller, his wife Betty, Betty's nineteen year-old son, William Harmon, and Harmon's sixteen year-old friend, Rodney Wood. The police questioned Miller as to the whereabouts of Harmon and Wood, and Miller informed the police that he had last seen Harmon and Wood at approximately midnight the previous evening when they left the residence. Miller consented to a search of his home, and two shotguns were found in the attic of a bedroom which Miller identified as Harmon and Wood's. Miller denied having seen the shotguns previously. Miller was not a suspect at this time.

On November 15, 1990, the Owensboro, Kentucky police notified authorities in Valparaiso that they had taken four individuals into custody, and that two of them

resided at 206 Holcomb, namely Harmon and Wood. Officers from the Indiana State Police and the Porter County Sheriff's Department traveled to Owensboro, transported Harmon, Wood, and two fifteen year-old girls, Stephanie Bell and April Bowman, back to Valparaiso, and interrogated them. Additionally, the police brought back a vehicle stolen from LaPorte, Indiana, which the quartet had driven to Owensboro, and the contents of the vehicle, including a black leather coat belonging to Christel Helmchen and a blue spotted shirt missing one sleeve that had been used to gag Helmchen.

Once in custody, both Wood and Harmon made statements to the police. Harmon's statement[2] was used to support the affidavit of probable cause made by Detective Ivan Blackman of the Valparaiso Police Department in seeking an arrest warrant for Perry Steven Miller, although Harmon did not testify at trial and his statement was not used further. Wood's statement[3], which substantially tracks that of Harmon, was played for the jury as a prior consistent statement after Wood's testimony was challenged during Miller's trial. Both Wood and Harmon described the attack on Christel Helmchen as follows.

On Monday, November 12, 1990, Miller started a conversation with Wood and Harmon, suggesting that he knew a place the pair could rob. TR 2053–54. Wood and Harmon had previously stolen several cars and had committed robbery and were

---

1. This statement of facts is drawn from the opinion of the Indiana Supreme Court, *Miller v. State*, 623 N.E.2d 403 (Ind.1993), except as noted.

2. Harmon's statement is found in the Affidavit for Probable Cause in the Trial Record (TR) at pages 30–33.

3. Wood's trial testimony is found at TR 2036–2226. The videotape was not transcribed, nor was it included in the record on appeal or in the record on PCR or before this court. However, it is discussed in the Affidavit for Probable Cause by Detective Blackman at TR 33 as substantially tracking that of Harmon, and the trial testimony substantially tracks that of Harmon. Therefore, this court is forced to assume that it is, in fact, substantially the same as Wood's trial testimony and Harmon's statement.

looking for money to fund a planned trip to Kentucky. Miller described the White Hen Pantry in Valparaiso as a good place to rob. The following evening, Tuesday, November 13, 1990, Wood and Harmon had several discussions with Miller regarding the White Hen Pantry, and also regarding Christel Helmchen, the clerk at the White Hen Pantry. TR 30, 2062. Both Wood and Harmon stated that Miller suggested they should kidnap, rape, and kill Helmchen as a part of the robbery. *Id.* The trio left the home at 206 Holcomb at approximately midnight on November 13, 1990 in Miller's vehicle, with Miller driving. Miller first drove to a construction site near Valparaiso to show the other two where he wanted them to bring Helmchen. TR 30, 2068–70. Miller then drove to the White Hen Pantry where he dropped off Harmon and Wood, having advised them to purchase two cans of pop, then to pull a weapon on Helmchen when she opened the cash register drawer. TR 31, 2075. Harmon and Wood did as advised, forced Helmchen to give them her keys, and took Helmchen in her car to the construction site. TR 31, 2077.

Harmon and Wood brought Helmchen into the home being constructed, and Harmon gagged her. TR 32, 2081. Miller had followed Harmon and Wood to the site in his car, and upon entering the home, began to fondle Helmchen. TR 32, 2082. As she attempted to move away from him, Miller threw her to the floor and continued to fondle her, tearing her blouse and removing her pants and underpants. *Id.* Miller then directed Wood to engage in sexual intercourse with Helmchen, which he did. *Id.* Although Wood did not ejaculate inside Helmchen, he finished in some

manner and got off, at which point Miller directed Harmon to engage in sexual intercourse with Helmchen, and Harmon did ejaculate inside Helmchen. *Id.* When Harmon was finished, Miller directed Harmon and Wood to tie Helmchen to a wall[4] which they did. Miller then began to hit Helmchen, first with his fists, then with a 2′ by 4′ piece of wood. TR 32, 2086. Harmon asked Miller for permission to hit Helmchen with his .12 gauge shotgun, and when granted permission, did strike Helmchen with the shotgun. *Id.* Miller also stuck Helmchen with an icepick or buck knife in her right breast and thigh. TR 32, 2088. All three men exited the home briefly to count the money from the robbery of the White Hen Pantry, then Miller told Harmon and Wood to find something with which to rectally assault Helmchen. TR 32, 2092. Harmon took the tire iron from Helmchen's vehicle and proceeded to rectally assault Helmchen with the tire iron while Wood held Helmchen's leg.[5] TR 33, 2093. Miller then told Harmon it was time to kill Helmchen. TR 33. Miller directed Wood to pull Helmchen's car around so that the lights would shine into the house. TR 2095. Harmon then escorted Helmchen, still bound and gagged, out of the home and down the hill to a point away from the home, where he shot her in the back of the head with his shotgun. TR 33, 2097.

Harmon then got into Helmchen's car with Wood, and they returned to the residence at 206 Holcomb, where Miller arrived a few minutes later. TR 2102. Wood and Harmon, along with two fifteen year-old girls, Stephanie Bell and April Bowman, then packed Helmchen's car and left for Kentucky at approximately 2:00

---

4. Actually, as the home was under construction, the wall was still in the framing stage and was just "a bunch of 2′ by 4′ studs." TR 2085.

5. There is some question as to whether Miller was present for this incident. Harmon stated that Miller watched, while Wood denied Miller's presence during this incident. Compare TR 33 with TR 2196.

a.m. on November 14, 1990. TR 2104. The quartet was arrested in Owensboro, Kentucky on the morning of November 15, 1990, while they camped a short distance from their vehicle. TR 2108. The following day, officers from the Porter County Sheriff's Department and Indiana State Police traveled to Owensboro to bring the four back to Valparaiso. TR 2109. Both Harmon and Wood gave statements to police at that time which implicated Miller in the murder. TR 33, 2110.

Miller was arrested by the Valparaiso Police Department in the early morning hours of November 17, 1990. TR 2858. He was found lying in a sandbox in his backyard covered with leaves, wearing a parka and several layers of clothing. TR 2858–59. An initial hearing was held on November 19, 1990, at which time Anthony

Bertig appeared as private counsel on behalf of Miller. TR 9. On November 26, 1990, Bertig was granted leave to withdraw his appearance, and on December 11, 1990, Ronald Aungst appeared as public defender for Miller [6]. TR 9–10.

A week later, Aungst filed a motion to set bail, a motion for early trial, and a motion to change venue. TR 10. At a hearing on December 28, 1990, the court granted Aungst's motion for early trial and set the trial for February 26, 1991. TR 57. The court denied the motion for change of venue, but ordered that the jury be drawn from a county other than Porter County. *Id.* On January 11, 1991, the state moved to continue the trial date to allow for the testing of certain evidence by experts, and the court granted that motion on January 15, 1991, resetting the trial for April 2,

---

**6.** One might be tempted, in contemplating the effectiveness of Miller's counsel, Ronald V. Aungst, to focus solely on *In re Aungst*, 467 N.E.2d 698 (Ind.1984), in which Aungst was disbarred, and *In re Aungst*, 553 N.E.2d 1200 (Ind.1990), in which Aungst was reinstated to the bar on May 10, 1990, seven months prior to his appointment as counsel in this case. However, in an unpublished opinion in *Sulie v. Duckworth*, 1990 WL 100899, 908 F.2d 975 (table)(7th Cir.1990), the Seventh Circuit wrote that "Ronald Aungst was disbarred in 1984 after he used money from a guardianship trust to pay office expenses and wrote a bad check on his personal account to an automobile dealer. This fact sheds no light on how Mr. Aungst conducted Sulie's defense in 1976. In fact, Mr. Aungst was a highly qualified and capable defense attorney. We have been given no reason to believe that Mr. Aungst was not competent in 1976. Sulie has not shown that the representation he received was outside the range of reasonable professional assistance [solely by the fact of Aungst's disbarment.]" In fact, Aungst was the attorney of record in a number of cases before the Indiana Supreme Court, Indiana Court of Appeals, and United States Court of Appeals for the Seventh Circuit. *See, Garr v. State*, 248 Ind. 295, 227 N.E.2d 171 (1967), *Hensley v. State*, 256 Ind. 258, 268 N.E.2d 90 (1971), *Martin v. Grutka*, 151 Ind.App. 167, 278 N.E.2d 586 (1972), *Kennedy v. State*, 258 Ind. 211, 280 N.E.2d 611 (1972) *on remand, Kennedy v. State*, 262 Ind. 295, 315 N.E.2d 350 (1974), *Farmer v. Werner Transp. Co.*, 152 Ind.App. 609, 284 N.E.2d 861 (1972), *Dyer Constr. Co. Inc. v. Ellas Constr. Co. Inc.*, 153 Ind.App. 304, 287 N.E.2d 262 (1972), *Linden Packing Co. Inc. v. Heinold Hog Market Inc.*, 156 Ind.App. 37, 294 N.E.2d 848 (1973), *Darmody v. State*, 156 Ind.App. 88, 294 N.E.2d 835 (1973), *Christy v. Bd. of Com'rs. of Porter County*, 156 Ind.App. 268, 295 N.E.2d 849 (1973), *Yuhasz v. Mohr*, 159 Ind.App. 478, 307 N.E.2d 516 (1974), *Pieper v. State*, 262 Ind. 580, 321 N.E.2d 196 (1975), *Collett v. State*, 167 Ind.App. 185, 338 N.E.2d 286 (1975), *Greenlee v. State*, 170 Ind.App. 639, 354 N.E.2d 312 (1976), *Sulie v. State*, 269 Ind. 204, 379 N.E.2d 455 (1978), *Jaremczuk v. State*, 177 Ind.App. 628, 380 N.E.2d 615 (1978), *Finney v. State*, 179 Ind.App. 316, 385 N.E.2d 477 (1979), *Owen v. State*, 406 N.E.2d 1249 (Ind.App.1980), *Walker v. State*, 274 Ind. 224, 410 N.E.2d 1190 (1980), *Ryan v. State*, 431 N.E.2d 115 (Ind.1982), and *Hodge v. State*, 442 N.E.2d 1006 (Ind.1982), as well as *United States v. Cortwright*, 528 F.2d 168 (7th Cir.1975) and *United States v. Black*, 543 F.2d 35 (7th Cir.1976). Therefore, this court will judge Aungst's representation of Miller, and not his history as an attorney.

1991. TR 74. Aungst filed a 46 page motion to dismiss the state's request for a death sentence on March 13, 1991, but that motion was denied by the court on March 25, 1991. TR 101–46, 163. On March 28, 1991, Aungst filed a motion to exclude evidence, arguing that because he had not yet received the expert reports on the physical evidence, the expert evidence should be excluded. TR 165–66. On April 6, 1991, after the jury had been selected, the court took up Aungst's motion. TR 1701. Aungst stated to the court that he had received the DNA report from the FBI the previous day, as well as the Indiana State Police forensic report that morning. *Id.* He thus asked the court to take the motion under advisement, and the court decided to let the motion pend, and gave Aungst leave to renew the motion during trial if he felt it necessary. TR 1702–03.

The jury was selected from a panel of citizens of Pulaski County over four days, from April 2—5, 1991, and was sequestered in Porter County for the duration of the trial. Opening statements were made on April 6, 1991, and the jury began hearing the evidence on April 8, 1991. TR 1712–42, 1744. In addition to the testimony by Rodney Wood related above, the jury heard from April Bowman and Stephanie Bell, the two girls that traveled to Kentucky with Wood and Harmon. Both testified that they were alone at the Miller residence from approximately 11:30 p.m. until 2:00 a.m. in the early morning hours of November 14. TR 2362, 2365. The prosecution also presented testimony from Karyl Kelley, a hardware store clerk, who testified that she had sold .12 gauge Remington shotgun shells to Miller the day before the murder. TR 2317. Lisa Black, a hair examiner from the Indiana State Police, testified that one of the pubic hairs recovered from the victim matched Miller's pubic hair standard. TR 2792. Dana Peterson, a serologist for the Indiana State Police, testified that she detected an enzyme marker on a swab taken from the victim which could have matched any of the three suspects, Miller, Harmon or Wood. TR 2651, 2654. However, evidence from Audrey Lynch, an Federal Bureau of Investigation DNA expert, suggested that only Harmon had left any trace of DNA in the victim. TR 2809. Additionally, the state put on evidence that Miller had previously visited the White Hen Pantry in Valparaiso while working on his delivery route and had made a comment to a coworker about Helmchen. TR 2286.

Miller presented a defense of actual innocence based on alibi and lack of proof. Miller's wife, Betty, testified that she called their home from work at 1:30 a.m. on November 14 and spoke with Miller. TR 2906–07. Additionally, Betty's coworker, Rena Murray, testified that she saw Betty on the phone, but she was unable to state with whom Betty was speaking. TR 2954–55, 2961. Additionally, clinical psychologist Frank Brogno testified during the defense case, stating that Miller had no psychological or psychiatric syndromes, and no severe or major personality disorders, and specifically that he "did not show powerfully aggressive and sadistic patterns of behavior or sadistic patterns in his thinking, his perception, his mood." TR 3056. Miller's counsel had brought out during his cross-examination of Wood that Miller had been in prison and was on parole "from a kidnaping and rape case," although Wood was unaware of that fact. TR 2114. However, the testimony by Brogno opened the door on rebuttal for the testimony of Etta Thomas and Bev Hunter, both of whom testified that they had been assaulted and raped by Miller. TR 3139–42, 3156–65. Additionally, Hunter testified that Miller had been tried and convicted for her assault. TR 3166.

Closing arguments were made to the jury on April 17, 1991, and the jury returned verdicts of guilty on all counts that day. TR 243–51. The following day, the penalty phase began. The state entered all of the evidence from the guilt phase and rested. TR 3355. Miller presented testimony from social worker David Sexton regarding his clean record while previously incarcerated. TR 3357. Additionally, Miller's step-daughter, Debbie Martinez, testified as to his gentle nature, and Miller's parents, Harry and Mildred Miller, both testified that they did not believe him to be aggressive or sadistic. TR 3359–63, 3364–66, 3368–71. Miller himself took the stand briefly and stated that "I'm sorry that this all happened, but, you know, I didn't have anything to do with it." TR 3373. Counsel made very brief closing arguments, and the jury returned a recommendation of death that afternoon. TR 282.

The court held a sentencing hearing on May 20, 1991. TR 3390–3419. Miller made a lengthy statement to the court reviewing the evidence and arguing that he had been falsely convicted of the crime to satisfy the public's need for revenge. TR 3393–98. The court then imposed a sentence of 220 years' imprisonment on the non-capital offenses, to be served consecutively, and a sentence of death on the capital offense, finding that four of the statutory aggravating circumstances existed, while no mitigating circumstances existed. TR 3415–17. The court appointed Mr. Aungst and the Porter County Public Defender's office to represent Miller on appeal. TR. 3419. After the trial court denied a motion to correct errors which was based solely on the presence of a juror who had heart

problems on the morning of the close of the guilt phase, who deliberated on the guilt phase, then had a heart attack while leaving the courthouse that evening and did not return for the penalty phase, Miller appealed directly to the Indiana Supreme Court.

In an opinion written by Justice Givan dated October 26, 1993, the Indiana Supreme Court rejected Miller's direct appeal of his conviction. *Miller v. State,* 623 N.E.2d 403 (Ind.1993). Miller first claimed fundamental error occurred when the prosecutor repeatedly stated his opinion as to the truthfulness of the witnesses and the guilt of the defendant. 623 N.E.2d at 407. The Indiana Supreme Court rejected this argument, finding that the prosecutor had only commented on the evidence and not on the ultimate issues of truthfulness and guilt. *Id.* at 407–08. Similarly, the court rejected the error asserted by the prosecutor calling the defendant a "mean s.o.b." *Id.* Miller also asserted that the prosecutor erred in quoting from the concurring and dissenting opinion in *United States v. Wade,* 388 U.S. 218, 256, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).[7] Although the Indiana Supreme Court disapproved of the use of that quotation, it did not find the use of the quote to be prosecutorial misconduct. *Id.* at 408. The court rejected all of Miller's challenges to the Indiana capital sentencing scheme, both as written and as applied, finding that all of the challenges had previously been decided by the court. *Id.* at 408–412. Miller also challenged the method by which *voir dire* was conducted, asserting that knowledge of his prior convictions tainted the pool. *Id.* at 412. However,

---

**7.** The prosecutor quoted from *Wade* as follows:

"Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent." That's my duty. "They must be dedicated

to make a criminal trial, a procedure of the ascertainment of the true facts surrounding the commission of the crime. To this extent, our so-called adversary system is not adversary at all, nor should it be."

the court found that Miller had waived the issue because he had not objected to the method at the time and he had peremptory challenges left when the jury was seated. *Id.* Miller also challenged the sufficiency of the evidence on his conviction for conspiracy to commit murder, but the court held that evidence existed to support the jury's finding on that count. *Id.* at 412–13. Miller continued his challenge from the motion to correct errors concerning the replacement juror between the guilt and penalty phases, but the court rejected that claim. *Id.* at 413. Finally, Miller argued that it was error to allow evidence of his criminal prior conduct. The court affirmed the trial court's decision that Miller had "opened the door" to his psychological profile by allowing Dr. Brogno to testify that he had no aggressive or sadistic tendencies. *Id.* Justice DeBruler wrote a concurring opinion in which he reviewed the appropriateness of the sentence and found that the aggravating circumstances outweighed the mitigating circumstances, thus making the death sentence appropriate. *Id.* at 414. Justice Dickson concurred in part and dissented in part, dissenting from the death sentence because of the use of the *Wade* opinion during closing arguments and because of the presence of alternate jurors in the jury room during the penalty phase deliberations. *Id.* at 415.

Miller did not file a writ of certiorari to the United States Supreme Court appealing the Indiana Supreme Court's decision on his direct appeal. Rather, he proceeded immediately to the Indiana post-conviction review process, beginning again in Porter County. The Indiana Public Defender entered its appearance on behalf of Miller, by deputies Ann Pfarr and Joanna Green. Post–Conviction Record (PCR) 15. The initial petition for post-conviction review was filed on March 17, 1995 and alleged the following claims of error: Miller was denied effective assistance of coun-

sel on direct appeal, Miller's conviction and sentence were unreliable because fundamental error occurred both at trial and on appeal, Miller was denied effective assistance of counsel at trial, the Indiana capital punishment statute was unconstitutional on its face and as applied to Miller, the imposition of the death penalty on Miller would violate the United States and Indiana Constitutions, and Miller did not receive a full and fair review of his conviction and sentence by the Indiana Supreme Court. PCR 51, 54–56. Miller's counsel also moved for a change of venue from Judge Bradford for the post-conviction proceedings. PCR 80–81. Judge Bradford granted that motion, and Judge Raymond D. Kickbush, of the Porter Circuit Court, was appointed as special judge to hear the post-conviction proceedings. PCR 115. Judge Kickbush initially set a date of January 10, 1996, for the hearing on the petition, then, on motion by Miller's counsel, continued the hearing to April 10, 1996. PCR 139. Miller, by counsel, filed his amended petition for post-conviction relief on February 14, 1996. PCR 193–283. The amended petition raised several specific errors, detailed as follows. First, that appellate counsel provided ineffective assistance by failing to present several errors to the Indiana Supreme Court, namely the trial court's refusal to hold the trial outside Porter County, the trial court's selection of a jury from Pulaski County, which counsel alleged was tainted by the publicity, the trial court's failure to appoint co-counsel until the first day of trial, the inclusion of an alternate juror during the penalty phase deliberations, which appellate counsel raised in a motion to correct errors, but did not raise before the Indiana Supreme Court, and that Miller was deprived of a fair trial under the totality of the circumstances. PCR 195–96. Additionally, Miller's counsel on direct appeal provided ineffective assistance of

counsel by failing to preserve issues from trial in the motion to correct errors or on appeal, including the admission of the Rodney Wood confession videotape, the denial of the change of venue motion, the grant of the state's motion for continuance after Miller had moved for a speedy trial, the rebuttal witness testimony, over defense objection, the inclusion of an alternative juror in the penalty phase after a trial phase juror had a heart attack, and the striking of a prospective juror based on her beliefs about the death penalty. PCR 196–201. The petition for post-conviction relief also asserted ineffective assistance of appellate counsel for their failure to pursue issues of ineffective assistance of trial counsel on appeal, their failure to obtain a complete transcript of the record (including the Wood videotape, which is still not in the official record), their failure to challenge the adequacy of the trial court's Judgment, including its failure to find any mitigating circumstances and its failure to make a separate determination of the appropriateness of the death penalty, their failure to fully present the *Wade* issue to the Supreme Court, and for their failure to have correct certain factual errors in their opinion, including naming Wood as Miller's stepson. PCR 202–07. The petition also asserted several fundamental errors of law, including errors in jury instructions, acts of misconduct by the prosecutor, abuse of discretion by the judge in making decisions on discovery, on voir dire, in appointing counsel for the defense, and in failing to make separate findings for sentencing, PCR 209–234. The petition further asserted ineffective assistance of trial counsel in trial counsel's failure to make an adequate investigation of the case against Miller, failure to review discovery materials provided by the state, failing to challenge the destruction of potentially exculpatory evidence, failing to request experts to test the DNA, serology, and hair evidence, failing to adequately prepare and utilize the psychological experts, failing to properly prepare for jury selection, failing to pursue his pre-trial motion to exclude evidence, failing to depose a number of state witnesses, failing to object to inappropriate questions by the state during its direct examination, failing to adequately cross-examine the state's witnesses, failing to object to the group venire during voir dire, failing to object to leading questions, the admission of the autopsy report and the competence of nine-year-old Josh Montmayor (who found Helmchen's checkbook in Miller's driveway), failing to file proper motions in limine regarding Miller's prior conviction and prior bad acts, failing to make an opening statement during the penalty phase, failing to object to the several incidents of prosecutorial misconduct,@ and was generally ineffective because he had not tried a capital case in the post-*Furman* era, had not tried a criminal case in the five years prior to his representation of Miller, and had not attended any criminal defense seminars until the time of trial. PCR 236–255. The petition for post-conviction review also made a number of challenges to the Indiana Death Penalty Statute and to the imposition of the death sentence in Indiana. PCR 256–278.

The hearing on the petition for post-conviction relief began on April 10, 1996. PCR 1010. The court accepted the record of the trial court proceedings into evidence, as well as several evidentiary affidavits and depositions from trial court witnesses. PCR 1014. Attorney Ronald Aungst was the first witness before the PCR court. PCR 1025. Aungst testified that he was appointed in November 1990 at a special rate of $75 per hour, and that he had attended a death penalty seminar in February 1991, shortly before Miller's trial. PCR 1025–26. No co-counsel was specifically appointed, but Robert Kentner volunteered to assist Aungst, and did as-

sist with research and investigation prior to trial. PCR 1027. Aungst testified that he filed a motion for speedy trial because he felt the state would not be able to get their evidence together, but that when the judge granted the prosecution's motion for continuance, he did not renew the motion for speedy trial because he felt the trial was set within a reasonable period of time. PCR 1064. Aungst stated, after reviewing his time records, that he had not received much of the state's evidence until April 10, 1991, which was after jury selection. PCR 1066. Aungst testified that he did not remember deposing several state's witnesses, and his time records did not reflect any depositions of those witnesses. PCR 1067–70. Aungst did depose Dr. Brogno during the first week of trial, prior to putting him on the stand during the guilt phase. PCR 1085.

Aungst was questioned about his efforts to investigate the check to Kabelin's Hardware, about which Karyl Kelley had testified at trial, and he stated that he had obtained Miller's checking records, but had not obtained those of the hardware store. PCR 1088. Miller's PCR counsel then entered into evidence the bank records of the hardware store and an affidavit from Sherree Miller, which showed that the "Miller 1206" discussed at trial was actually a check from Sherree Miller's account, not Perry Miller, and that Sherree was not related to Perry. PCR 1099–1100.

On cross-examination by the state, Aungst stated that he did not hire serology, hair or DNA experts because he did not believe the evidence from those items to be "damning" to his client. PCR 1108–09. Aungst stated that he did not believe it was a "calculated risk" to have Dr. Brogno testify to Miller's "lack of sadistic behavior," and that Miller had concurred in the decision to have Brogno testify. PCR 1111. The state also questioned Aungst about his legal experience, and Aungst

stated that he had practiced law for twenty-three years at the time of the Miller trial, had participated in hundreds of jury trials, between fifteen and twenty murder trials, and three capital cases. PCR 1117. On redirect, Miller's PCR counsel brought out that Aungst's capital murder experience had been in the early 1970's, and that Aungst had been disbarred for almost six years prior to Miller's trial. PCR 1120, 1122.

Robert Kentner then testified regarding his work as co-counsel. PCR 1123. Kentner testified that he had attempted to have the pubic hair tested, but as they had not received the hair test results until the first day of trial, he was unable to find a lab to have a test done in a timely manner. PCR 1127. John Martin testified regarding his work as appellate counsel for Miller. PCR 1138. Martin had not previously worked on a capital appeal, although he did attend a death penalty seminar in February 1991. PCR 1139.

At the hearing, several witnesses testified about evidence that should have been addressed at trial. Richard Bisbing, an independent hair examiner, was called. PCR 1336. Bisbing testified that his examination of the pubic hair found on Helmchen's thigh was one of Helmchen's hairs and did not match Miller's known pubic hair standards. PCR 1352. Thomas Fedor, an independent serologist, testified that the state police serologist's testimony that Miller was part of three percent of the population from whom a certain genetic marker would be found was misleading, because the state serologist failed to take into account the victim's blood in the mixture in which the marker was found. PCR 2054. Pam Porter, a certified social worker and mitigation specialist, testified that she found a significant amount of mitigating information about Miller that had not been produced at trial, including informa-

tion about the death of a sibling, Miller's protective relationship with another sibling, a possible molestation when he was in grade school, and possible abuse by a grandfather. PCR 2069–71. Jack Duckworth, former Superintendent of the Indiana State Prison and an individual with whom this court is well familiar, testified that Miller had been a trusty during his first incarceration, assigned to a minimum security building outside the wall of the facility. PCR 2083. Duckworth also testified that Miller had adjusted well to prison life and had been very dependable in his prison duties. PCR 2085.

After both sides filed supplemental briefs, the court ruled on the petition for post-conviction relief on July 22, 1996. PCR 775. The PCR court found that Miller sought relief in three main areas: fundamental error by the trial court, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel. PCR 777. Looking first at the ineffective assistance of counsel claims, the court considered the standard established by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and adopted by the Indiana Supreme Court in *Lawrence v. State*, 464 N.E.2d 1291 (Ind. 1984). PCR 778. The PCR court, citing *Hall v. State*, 646 N.E.2d 379 (Ind.App. 1995), first held that Miller's claims of ineffective assistance of trial counsel failed because his appellate counsel was different from his trial counsel, and that his appellate counsel failed to raise the trial counsel's ineffective assistance on direct appeal. PCR 779.

On Miller's assertions of fundamental error, the PCR court held that jury instructions in both the guilt and penalty phases of the trial were correct statements of the law, and thus their inclusion did not constitute fundamental error. PCR 782. On Miller's assertions of ineffective assistance of trial counsel, to extent those as-

sertions were not waived by Miller's appellate counsel's failure to assert them on direct appeal, the PCR court held that on the hair and serology evidence, Miller's trial counsel familiarized himself with the sciences of hair analysis and serology, and furthermore, there was no evidence that the discovery Aungst did not do would have changed the verdict. PCR 784. Thus, there was no real evidence of deficient performance or of prejudice, and so the PCR court did not find ineffective assistance of counsel on those claims. PCR 784. Similarly, the court found that because Aungst was not given the name of the tire and shoe print expert, he was not ineffective for failing to investigate the tire and shoe print evidence. PCR 785. The court found Aungst's decision not to pursue his speedy trial motion after the state moved for a continuance to be a trial tactic and not an example of ineffective assistance. PCR 786. The PCR court determined that Aungst's efforts during voir dire did not fall below the standard of reasonableness under prevailing professional norms. PCR 788. The court held that Aungst's eliciting from Rodney Wood and April Bowman on cross-examination that Miller had previously been in prison for rape and kidnaping was a trial tactic and not ineffective assistance. PCR 789. The court held that Aungst's cross-examination of Karyl Kelley, the Kabelin Hardware clerk, was not ineffective (although the court did not address the assertion of Aungst's failure to investigate the check). PCR 790. The PCR court further held that the presentation of Dr. Brogno, which opened the door to the rebuttal evidence of the prior rape victims, was a trial tactic and was not ineffective assistance of counsel. PCR 791. Finally, the court held that Aungst's presentation of mitigating evidence was not ineffective. PCR 792.

On the issue of ineffective assistance of appellate counsel, the PCR court held that

appellate counsel did not provide ineffective assistance of counsel when he failed to include the Rodney Wood video in the record and when he failed to appeal the use of that video. PCR 795. Additionally, the court found that the failure to appeal the use of several jury instructions was not ineffective assistance, nor was the failure to challenge the adequacy of the trial court's sentencing order. PCR 796. Finally, the court held that appellate counsel was not ineffective in its presentation of prosecutorial misconduct on direct appeal. PCR 799. Because the court found that Miller did not show ineffective assistance of counsel either by his trial or appellate counsel, and because the court did not find any fundamental error, the court denied Miller's petition for post-conviction relief.

Miller appealed the denial of his petition for post-conviction relief to the Indiana Supreme Court. In a unanimous opinion written by Justice Sullivan, the Indiana Supreme Court affirmed the decision of the PCR court to deny Miller's petition for post-conviction relief. *Miller v. State,* 702 N.E.2d 1053 (Ind.1998). The court first reviewed Miller's assertions of ineffective assistance of counsel. 702 N.E.2d at 1058. Although it primarily relied on Indiana case law, it is clear that those cases were based on the United States Supreme Court decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Indiana Supreme Court initially remarked that it had recently held that where a claim of ineffective assistance of counsel was "not raised on direct appeal, [it] may be presented in postconviction proceedings." *Woods v. State,* 701 N.E.2d 1208, 1220 (Ind.1998), and thus Miller had not waived his claims of ineffective assistance of trial counsel. 702 N.E.2d at 1059.

The court addressed several instances of ineffective assistance of trial counsel and found each to be within the bounds of acceptable performance. *Id.* The court found that Aungst's failure to request a continuance when he received the hair, serological, and DNA evidence on the first day of trial was a trial tactic and not ineffective assistance. *Id.* at 1060. Similarly, the failure to retain experts for the physical evidence did not cause ineffective assistance of counsel because Aungst effectively cross-examined the state's experts on these matters. *Id.* at 1063. The court held Aungst's failure to obtain tire and shoe print evidence was not ineffective because the state brought out the lack of matching prints in its own case. *Id.* at 1064. Miller's claim that Aungst tainted the jury by failing to apologize after he had his son take pictures of their homes in an effort to assist his jury selection was rejected because the court found Aungst did actually apologize for that action. *Id.* at 1065. The court found that although Aungst could have performed a more thorough investigation of the Kabelin Hardware check, he did effectively cross-examine Karyl Kelley and he introduced evidence about Miller's actual checking account. *Id.* at 1066. Thus, his actions on that issue were not ineffective. *Id.* Aungst's use of Dr. Brogno, which opened the door to the rebuttal testimony of Miller's two prior rape victims, was found not to be ineffective assistance of counsel because the court found Aungst had made a tactical decision regarding the need to bring in positive evidence versus the potential negative effects of the rebuttal testimony. *Id.* at 1067. Finally, the court held that Aungst's failure to bring out certain mitigating testimony regarding Miller's behavior in prison, his social history, and residual doubt was not ineffective assistance of counsel because Aungst's decision on Miller's prison history was a tactical decision, Aungst did present some evidence regarding Miller's social history, and the issue of residual

doubt was also a tactical choice. *Id.* at 1069–70.

The court rejected Miller's claims of ineffective assistance of appellate counsel also. *Id.* at 1070. Miller's first claim concerned the Rodney Wood video confession tape. *Id.* The court held that appellate counsel made a tactical decision regarding the tape, and that the use of the tape was appropriate under Indiana law at the time. *Id.* at 1071. The court affirmed the PCR's court finding that Miller's appellate counsel's failure to challenge the sentencing order was not ineffective because the trial court did make adequate findings regarding the existence of aggravating circumstances and lack of mitigating circumstances. *Id.* at 1072. Miller's claim that appellate counsel failed to raise as error the trial court's failure to admonish the alternate jurors not to participate in deliberations was found not to be ineffective assistance of counsel, because the court found that the trial court did make an admonishment to the jurors before the penalty phase which reminded them that, like the guilt phase, they could not participate in deliberations. *Id.* at 1073. Finally, the court held that Miller's appellate counsel's failure to raise as error the alleged *Doyle v. Ohio*[8] violation was not ineffective assistance because of the limited nature of the statement, trial counsel's failure to object, and the lack of any further reference to the issue constituted only harmless error *Id.* at 1074.

Finally, the Indiana Supreme Court rejected Miller's assertion that they had failed to make a meaningful review of his death sentence, holding that an independent review of the sentence was implicit in the main opinion and that one justice had made a separate opinion solely addressing the appropriateness of the death sentence. *Id.* Having rejected all claims, the court affirmed the denial of Miller's petition for post-conviction relief. *Id.* The United States Supreme Court denied Miller a writ of certiorari on January 10, 2000. *Miller v. Indiana,* 528 U.S. 1083, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000).

## II. Standard of Review

■ A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for 'the Supreme Court of the United States in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim

---

**8.** *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) held that "the use for impeachment purposes of petitions' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. 2240. In this case, at the end of

the direct examination of the officer that arrested Miller, the prosecutor asked the officer if Miller had given a statement after hearing his *Miranda* rights, and the officer replied "No ma'am. He said he didn't wish to speak to me."

that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As such, the AEDPA provides a "new, highly deferential standard for evaluating state court rulings." *Lindh v. Murphy,* 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Supreme Court handed down an opinion further explaining the application of the AEDPA on April 18, 2000, in *Terry Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[9] *Terry Williams* specifically addresses the application of the "contrary to, or involved an unreasonable application of, clearly established law" language from the AEDPA in the *Strickland* context.[10] 120 S.Ct. at 1499. In a divided opinion, Justice O'Connor delivered the opinion of the court regarding the appropriate interpretation of that clause. *Id.* at 1516. Specifically, the court held that "contrary to" and "involved an unreasonable application of" clauses of the statute have independent meaning. *Id.* at 1519. The court defined "contrary to" as an instance where the state court "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially

---

**9.** The United States Supreme Court also issued an opinion in *Michael Wayne Williams v. Taylor,* 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) on April 18, 2000. While that opinion also addresses the AEDPA, it primarily concerns the need for an evidentiary hearing in the federal district court. As such has not been requested here, this order will not discuss that case. It will, however,

differentiate the two *Williams* cases by using the first names of the petitioners therein.

**10.** Because both *Terry Williams* and *Michael Wayne Williams* were handed down after oral argument in this case, this court ordered both sides to file supplemental briefs regarding the impact of these cases on Miller's claims. The court appreciates the prompt homework performed by counsel for both sides.

indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20. The court held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. Concluding the section of her opinion defining the statute, Justice O'Connor stated as follows:

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 1523.

■ It remains basic to this day that claims of constitutional violations must first be fairly presented to the state court, as defined by Justice Scalia in *Castille v. Peoples,* 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and reaffirmed most recently in *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In *Moore v. Parke,* 148 F.3d 705 (1998), the Seventh Circuit explained that:

> A prerequisite for applying this section is that the state court adjudicated the issue before us on the merits.... [Because] the state courts did not address Moore's sufficiency of the evidence argument on the merits, ... the new standard of review in AEDPA does not apply.

148 F.3d at 708. However, the court went on to explain that the petitioner must first have "provided the state courts with a full and fair opportunity to review his claims." *Id.,* citing *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The Seventh Circuit has provided the following framework to determine whether a state court has been provided a fair opportunity to consider a petitioner's federal constitutional claims:

> If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin v. O'Leary,* 972 F.2d 1467, 1473–74 (7th Cir.1992). Petitioner, here represented by able and experienced death penalty counsel, has the burden to establish a basis for federal collateral relief.

## 1074

### III. Ineffective Assistance of Trial Counsel

█ Miller's first claim before this court is that he had ineffective assistance of counsel at his trial. That claim is considered under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on this claim, Miller must establish two elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Id.* at 687–88, 104 S.Ct. 2052. For the first prong, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

█ There is no question after *Terry Williams* that *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) "qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Terry Williams*, 120 S.Ct. at 1512. Additionally, it is clear that the Indiana Supreme Court has not decided this issue in a manner "contrary to ... clearly established Federal law." Miller has argued that the

Indiana Supreme Court's analysis of ineffective assistance of counsel claims is led more by its own pre-*Strickland* law in cases like *Terry v. State*, 465 N.E.2d 1085 (Ind.1984) and *Hollon v. State*, 272 Ind. 439, 398 N.E.2d 1273 (1980), in which it requires that the "defense as a whole must be inadequate." *Miller*, 702 N.E.2d at 1059, citing *Davis v. State*, 675 N.E.2d 1097 (Ind.1996)(quoting *Terry*). However, the Indiana Supreme Court went on to define that phrase from *Strickland*, quoting as follows:

> [S]ince there are countless ways to provide effective assistance in any given case, unless consideration is given to counsel's overall performance, before and at trial, it will be all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)(quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

702 N.E.2d at 1053. As the Indiana Supreme Court clearly bases its analysis of ineffective assistance of counsel claims under the two-part test of *Strickland*, this court cannot find that the Indiana Supreme Court's analysis is contrary to clearly established Federal law.[11] Thus the sole question for this court is whether the Indiana Supreme Court's decision affirming the denial of Miller's petition for post-conviction relief "involved an unreasonable application of" *Strickland*.

11. Miller also argues that the Indiana Supreme Court ruled in a manner "contrary to ... clearly established Federal law" when it required petitioner to "convince the appeals court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the trial court." 702 N.E.2d at 1058. Miller argues that the court's standard of review for PCR appeals adds an additional layer to the *Strickland* test, contrary to *Strickland*. This court does not find that the state court's standard of review under state law adds an element to the *Strickland* test, as it is clearly applied to the appeal as a whole and not simply the *Strickland* issues presented. Thus, this argument is rejected.

## A. Hair Evidence

■ Miller first claims that his trial counsel, Aungst, was ineffective during the guilt phase of the trial in his efforts concerning the hair evidence. On direct examination at trial, the state's hair examiner stated that a pubic hair found on Helmchen's thigh was almost certainly that of Miller. TR 2761. At the PCR hearing, an independent hair examiner hired by Miller stated that the pubic hair in question was more similar to that of the victim and did not share any characteristics of Miller's pubic hair. PCR 1351–52. Miller asserts here that Aungst provided ineffective assistance of counsel on this issue by failing to hire an expert to test the hair, by failing to depose the state's hair examiner prior to trial to more fully understand her report, and by failing to request a continuance from the trial court, which it had offered to entertain, to better understand the belated test results. Aungst and Kentner testified that Aungst had Kentner try to contact two labs to see if they could analyze the evidence prior to trial, from which Kentner had negative results, and Kentner found two forensic journal articles on hair analysis which Aungst used in his cross-examination of the state's witness. PCR 1127.

The Indiana Supreme Court, in reviewing this issue, found that Aungst forced the state's witness on cross examination to acknowledge "that hair analysis is not able to identify the individual who is the source of the sample examined with as high a degree of probability as fingerprint or serological analyses," and that she could not state with certainty that "the pubic hair did indeed come from [Miller]." 702 N.E.2d at 1061. It also considered the statement by Dr. Bisbing, the independent examiner, that the state's examiner had conducted her hair examination "in a generally accepted manner." *Id.* Thus, the court determined that evidence existed to

support the PCR court's determination that Aungst's performance was not deficient on this issue. *Id.*

Miller argues here that Aungst was ineffective in his handling of the pubic hair issue because he did not independently investigate the conclusions of the state's expert, because he did not effectively cross-examine the state's witness, and because his reliance on two scientific journals did not enable him to test the reliability of the state expert's conclusions. The Indiana Supreme Court held that because Aungst elicited the above-cited acknowledgment from the state's hair examiner, it was not deficient performance for counsel not to have secured independent experts, citing *Huffington v. Nuth*, 140 F.3d 572, 580–83 (4th Cir.1998), *People v. Bolin*, 18 Cal.4th 297, 75 Cal.Rptr.2d 412, 956 P.2d 374, 400 (1998), and *Commonwealth v. Harris*, 550 Pa. 92, 703 A.2d 441 (1997). While this court is not impressed with Aungst's handling of this issue, it is unable to say that the Indiana Supreme Court unreasonably applied the *Strickland* test to the facts of this case on this issue. Therefore, this court does not find deficient performance on this issue.

## B. Serology and DNA Evidence

■ Miller next challenges his trial counsel's handling of the serology and DNA evidence. At trial, the state's serology expert testified on direct that when she tested the body fluid recovered from the victim's inner thigh and vagina, she found an enzyme marker which was foreign to the victim, but could have come from Harmon, Wood or Miller. TR 2561, 2654. On cross-examination, Aungst elicited testimony from the serology expert which incorrectly narrowed the percentage of potential donors to 3% from 26%. TR 2703–04. A serology expert presented by Miller at the PCR hearing stated that the characteristics in the fluid mixture used by the state

serology expert at trial to narrow the donor population could have come from the victim's blood, which was part of the mixture, and thus were incorrectly used to suggest that Miller was part of a donor population which constituted only 3% of the public as a whole. PCR 2057. Furthermore, DNA testing was done on the same samples of fluid prior to trial, and that testing conclusively identified Harmon as the donor. TR 2809. The FBI expert who performed the DNA testing did testify at trial and testified that Harmon was the donor, but she did not explicitly state that Miller was not the donor. TR 2810–11.

Miller asserted on PCR that his counsel was ineffective on this topic because he failed to depose either the state serology expert or the FBI DNA expert prior to trial, he did not understand the significance of either expert's findings, he did not independently investigate the serology and DNA evidence, and he did not consult with or seek to retain an expert on these topics. PCR 1108–10. The Indiana Supreme Court, on direct appeal from the post-conviction court, found that Aungst's cross-examination of the serological and DNA experts was sufficient to meet the requirements of *Strickland*. *Miller*, 702 N.E.2d at 1062–63. After eliciting the 3% comment from the serological expert, Aungst asked the expert if it was possible that the dried blood came from Miller alone, and she responded "the dried blood could not have come from Perry Miller alone if it was his present." TR 2704. The Indiana Supreme Court found this exchange to have cast doubt upon the serological expert's opinion. *Id.* Similarly, on his cross-examination of the DNA expert, Aungst asked if the expert had found anything connecting Miller to the exhibits, and she responded "On the exhibits in which I obtained conclusive results, those all matched William Harmon." TR 2811. The Indiana Supreme Court held that the

difference between this testimony at trial, and the DNA expert's statement at PCR that the DNA results excluded Miller were purely semantic. *Id.* at 1063.

As with the hair evidence, Miller argues here that Aungst was ineffective because he failed to investigate the serology and DNA evidence to understand the exculpatory nature of the DNA evidence and the appropriate way to consider the serological evidence. He did not depose either of the experts presented by the state on these issues, nor did he attempt to retain his own experts on these issues. And, argues Miller, his failure to elicit the positive statement "the DNA was not Miller's," rather than the statement he got that "the DNA was Harmon's," left the misleading impression that Miller could have also left DNA and failed to correct the misimpression caused by the 3% population comment elicited from the serological expert. The Indiana Supreme Court considered these claims under the bounds of *Strickland* and found that counsel's performance was not deficient on these issues. 702 N.E.2d at 1063. This court does not find the decision of the Indiana Supreme Court to be an unreasonable application of the *Strickland* test and therefore cannot grant the writ on the serological and DNA issues.

## C. Tire and Shoe Print Evidence

▋ Miller asserts that his trial counsel provided him ineffective assistance of counsel because he failed to present exculpatory evidence that no tire or shoe prints were found at the scene of the crime which matched Miller's. During his opening statement, Aungst told the jury that there would be evidence from the scene which would point away from Miller's participation. TR 1734. However, Miller argues, no such evidence was presented, either by the state or by Miller. During the PCR hearing, Miller presented evidence that the state's shoe and tire print expert

would have testified at trial that the prints found at the scene did not match Miller's. PCR 2254. The expert's report was turned over to Aungst on the morning of trial with the other evidence, but Aungst did not contact or depose the expert, nor did he call him as a witness. PCR 2248–49.

The Indiana Supreme Court, in its review of the post-conviction proceedings, found that Aungst's failure to use the tire and shoe print evidence was not deficient because the state presented "substantially the same exculpatory testimony." 702 N.E.2d at 1054. Specifically, Valparaiso assistant police chief Robert Taylor testified that he was unable to match the tire and shoe prints to anyone. TR 1930. The court found that Miller's counsel was not deficient for failing to present exculpatory evidence when the same evidence was provided by the state in its case. *Id.* at 1064. Thus, that court did not find Miller's counsel ineffective in that instance. *Id.*

Miller argues here that the testimony provided by Taylor is not substantially the same as that which the state's tire and print examiner would have provided. Taylor did not state that Miller's shoes and car had been tested and found dissimilar, and the jury was not presented with sufficient evidence from which to make the inference that Miller had been excluded as a possible source of tire or shoe prints. Thus, Miller argues that the Indiana Supreme Court's finding is based on speculation and is thus an unreasonable application of the facts in this case to the *Strickland* standard. This court disagrees. The Indiana Supreme Court's determination of the facts under the *Strickland* standard is not unreasonable, and thus this court will not find ineffective assistance of counsel on this issue.

### D. Impeachment Evidence

■ Miller argues that his trial counsel was ineffective in his treatment of the Kabelin hardware clerk's testimony. At trial, Karyl Kelley, a clerk at Kabelin's Hardware, testified that on Monday, November 12, 1990, Miller had purchased several items from her at Kabelin's, including some Remington .12 gauge shotgun shells. TR 2317. Kelley stated with certainty that Miller was the individual who had a written a check listed on her deposit slip as "Miller 1204." TR 2331. However, during the post-conviction proceedings, Miller was able to establish through Kabelin's bank records that the "Miller 1204" check which Kelley had linked to Perry Miller was actually a check on the account of Sherree Miller, a woman unrelated to Perry Miller, and was written on November 11, 1990. PCR 1095, 1099–1100. Additionally, it was shown that no Remington shells were found at the scene.

At PCR, Miller argued that his trial counsel was ineffective for failing to discover the true author of the 'Miller 1204' check. The Indiana Supreme Court, however, determined that Miller's counsel was not ineffective because he did cast doubt on Kelley's testimony by showing the discrepancy between her testimony and a police statement taken from her previously and by having Miller's wife Betty testify about their joint checking account, which did not have any checks written in the relevant amount and which did not use any checks numbered 1204 during the relevant period. 702 N.E.2d at 1066. The court thus stated that although Aungst could have done more to investigate Kelley's statement, he did cast doubt on her testimony with the evidence of the Millers' checking account. *Id.*

Miller argues here that the Indiana Supreme Court was unreasonable in its application of the *Strickland* standard to these facts because Aungst did not get Kelley to admit the discrepancy between her recollection and the police report (Kelley stated that the police officer must have been mis-

taken) and because Aungst did not highlight the lack of Remington shells in evidence, which would have further bolstered his defense. Although the Kelley evidence against Miller is questionable at best, this court cannot say that the Indiana Supreme Court's decision was unreasonable under *Strickland.* Therefore, this court will not grant any relief under 28 U.S.C. § 2254.

### E. Negative Character Evidence

■ During the defense case, Miller's trial counsel presented the testimony of Dr. Frank Brogno that Miller did not possess aggressive or sadistic tendencies. TR 3058. This testimony by Brogno opened the door for the state to present rebuttal testimony from two women who had previously been assaulted and raped by Miller, including the victim for which Miller was convicted and incarcerated. TR 3137–72. Trial counsel testified at PCR that he understood the law on character and impeachment evidence and realized he was opening the door to the evidence of Miller's prior rapes by offering Dr. Brogno's testimony, but stated that he believed all of the jurors were already aware of Miller's criminal history due to pre-trial publicity, and so presenting Dr. Brogno was not a risk. PCR 1078, 1081, 1116, 1111. Further testimony at PCR suggested that Dr. Brogno's opinions were questionable because he did not take into account the allegations and facts of Miller's prior convictions in forming his opinion. PCR 2102–03. A clinical psychologist testified at the post-conviction proceedings that Brogno would have needed to ignore both Miller's past history and his objective test results to reach the conclusions he presented at trial. PCR 2275.

The Indiana Supreme Court, in reviewing this issue, determined that "the decision to put on positive character evidence and risk rebuttal with negative character evidence as another example of the kind of strategic choice which is within the province of counsel, *Parrish v. State,* 453 N.E.2d 234, 240 (Ind.1983), just as other jurisdictions have viewed the decision not to put on positive character evidence in order to avoid damaging rebuttal evidence as a strategic choice, for example, *Ohio v. Mason,* 82 Ohio St.3d 144, 694 N.E.2d 932, 956 (1998); *Jones v. Delo,* 56 F.3d 878, 886 (8th Cir.1995)." 702 N.E.2d at 1067. Additionally, the court found that the trial court had properly instructed the jury on the issue of prior bad acts.

Miller's counsel argues here that the Indiana Supreme Court's review of this issue was an unreasonable determination of the facts in light of the evidence at PCR. Primarily, Miller's counsel here asserts that his counsel at trial should have known that Dr. Brogno's opinion was invalid and thus should not have been presented to the jury, thus avoiding the prior bad acts evidence. Additionally, Miller complains here that Aungst first assumed that the jury knew of his prior bad acts, and then brought out the evidence of Miller's prior bad acts during the testimony of Rodney Wood, when in fact, Wood was unaware of the cause of Miller's prior conviction. This court finds it absurd to suggest that Miller's trial counsel should have known that his expert's opinion was in error, and thus his decision to put on the expert was unreasonable, rather than a strategic choice. Aungst specifically stated that he made a strategic decision, and while in hindsight, that decision seems quite poor, it is exactly that kind of decision which *Strickland* protects. Therefore, this court will not find the Indiana Supreme Court's decision on this issue an unreasonable application of the *Strickland* standard.

### F. Mitigation Evidence

■ Miller contends here that his trial counsel did not provide him effective assistance in presenting mitigation evidence to

the penalty phase jury or to the court before sentencing. In the penalty phase, he presented testimony from Miller's parents and his stepdaughter. TR 3363, 3366, 3370. All three testified that they knew Miller to be a kind, caring individual who did not exhibit any aggressive or sadistic tendencies. *Id.* Additionally, David Sexton, a social worker who had assisted with jury selection, testified concerning a few areas of Miller's previous prison record; specifically, that he had obtained his GED, was president of the Jaycees, was a trustee, and had only been written up once while in prison, and that one time for "dirty cell bars." TR 3357-58. Additionally Miller personally testified during the penalty phase, but he limited his testimony to expressing regret for the victim's death and maintaining his own innocence. TR 3371.

At PCR, Miller's parents testified that they had felt unprepared for the testimony they did make during trial, and they stated that they would have added much more had they been asked. PCR 2204, 2207. Specifically, Miller's first younger sibling died three days after birth, which was traumatic for the young Miller. PCR 2205. Miller's second younger sibling developed a seizure disorder and Miller allowed that sibling not only to sleep with him, but to hold his ear while sleeping. PCR 2206. Because Miller assisted his brother, he was somewhat stigmatized in his small hometown of Tipton. PCR 2105.

The PCR hearing further revealed that Miller had been a model prisoner during his initial incarceration, taking correspondence courses from Indiana University, adapting well and being a positive influence on other inmates. PCR 1651, 2086. As a trustee, Miller lived in an honor dorm outside the walls of the prison and drove a delivery truck outside the prison. PCR 1744, 2084. He also participated in programs inside and outside the prison, such

as Project Inform, PACT, Prisoners and Community Together, the Brotherhood of Concern, and the Prisoner's Alliance Council. PCR 2086, 1767, 1680, 2084. At PCR, Miller's trial counsel stated that he did not present this evidence because he did not want to overemphasize that aspect of Miller's life. PCR 1116.

The Indiana Supreme Court, in its review of the PCR court, held that Aungst's decision not to overemphasize Miller's prison record was a tactical decision within the bounds of *Strickland* and thus not deficient performance. 702 N.E.2d at 1069. It further found that Aungst's presentation of Miller's social history was adequate to inform the jury of a possible mitigating circumstance. *Id.* Thus, it did not find ineffective assistance of counsel for Miller on this claim. *Id.*

■ Miller argues here that trial counsel did not adequately investigate Miller's prison history or social history such that he could make an informed strategic decision regarding those issues. Miller presented only seventeen pages of transcript of testimony during the penalty phase and three pages of argument. TR 3356-73, 3384-87. Under *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), Miller's ability "to make a well behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." Additionally, the manner in which that evidence is presented is also relevant under *Skipper.* 476 U.S. at 8, 106 S.Ct. 1669. Miller argues that his trial counsel completely failed to present this evidence in sufficient quantity to make it useful to the jury. This court does not agree. Although certainly there was more evidence of Miller's adjustment to prison that could have been presented, Aungst made a strategic decision to avoid "continually putting that aspect" of Mil-

ler's life before the jury. PCR 1116. And while somewhat difficult, Miller's childhood is not the horror which arises in many capital cases. 702 N.E.2d at 1069. This court does not find the Indiana Supreme Court's application of these facts to the *Strickland* standard to be unreasonable, and thus cannot grant a writ on this issue.

Miller asserts that both the individual and cumulative impacts of the above-alleged deficient performances are sufficient to create ineffective assistance of counsel under the *Strickland* rubric. However, as this court has found no deficient performance, as did the Indiana Supreme Court, there is nothing to give rise to the actual prejudice prong of the *Strickland* decision. This court has found above that the Indiana Supreme Court made a reasonable application of the facts in this case to the *Strickland* requirement of deficient performance, and as no deficiencies have been found, the issue of prejudice need not be addressed.

### IV. Ineffective Assistance of Appellate Counsel

 Miller also claims that he received ineffective assistance from his counsel on direct appeal. As with his claim of ineffective assistance of trial counsel, this claim must be considered under the familiar *Strickland* standard. Again, the question is whether the Indiana Supreme Court made an unreasonable application of the facts in this case to the *Strickland* rule. When the efficacy of appellate counsel is questioned, the court must remember that "one of the principal functions of appellate counsel is winnowing the potential claims so that the court may focus on those with the best prospects." *Page v. United States*, 884 F.2d 300, 302 (7th Cir.1989).

### A. Failure to Challenge Sentencing Order

 In its sentencing order, the trial court stated "[t]he Court finds that it has been proved beyond a reasonable doubt that all four of these aggravating circumstances exist. The Court finds no mitigating circumstances." TR 321. No further explication of potential mitigating circumstances was made. Under *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the state is required to consider all relevant mitigating circumstances before rendering a sentence of death. The Indiana Supreme Court determined that because the trial court did not find any mitigating circumstances, its sentencing order was not in error, and thus appellate counsel's decision not to raise this issue on appeal was not deficient performance. 702 N.E.2d at 1072.

Miller argues here primarily that the trial court judge failed to follow state law in rendering his sentence, but that is not the province of this court. The Indiana Supreme Court determined in two separate opinions that the trial court's sentencing order was complete, and this court finds that determination reasonable within the bounds of § 2254. Therefore, appellate counsel's decision not to challenge the sentencing order was not deficient performance.

### B. Admonishment to Jury

 Appellate counsel did raise as error the fact that the alternate jurors were permitted in the jury room during the guilt phase deliberations. PCR 1229. However, appellate counsel did not appeal the judge's failure to admonish the alternates not to participate in deliberations during that phase. As Miller notes, the Indiana Supreme Court, on direct appeal, found no error in the alternates' presence in the jury room "as long as they were properly instructed not to participate in those deliberations." 623 N.E.2d at 413. But, Miller argues, no such admonishment was made to the alternates, and thus error did occur.

The Indiana Supreme Court, in reviewing this issue after the PCR hearing, found that an inference could be made that the admonishment had been given from the admonishment given to the alternates prior to the penalty phase, when the trial court reminded the alternate that he could not participate in deliberations in this phase just as he was not allowed to participate during the guilt phase deliberations. 702 N.E.2d at 1073. Thus, the court found appellate counsel's performance was not deficient for failing to raise this issue on direct appeal. This court concurs with the judgment of the Indiana Supreme Court. Although the record does not reflect an admonishment to the alternates prior to the jury's deliberation in the guilt phase, the admonishment made prior to the penalty phase supports the inference that such an admonishment was made and not recorded. Thus, appellate counsel was not ineffective for failing to address this issue on direct appeal.

## C. Fifth Amendment Violation

■ During the trial, the officer who arrested Miller testified regarding the arrest. At the end of his testimony, he mentioned that he read Miller his *Miranda* warnings, and stated that Miller "didn't wish to speak to me." TR 2860. The state did not make further reference to this testimony during the trial. Miller argues that this exchange clearly violates his constitutional rights under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The Seventh Circuit has held that where the state comments during closing argument about a defendant's silence, "given the clarity of the Fifth Amendment violation ... counsel's failure to raise this issue on appeal was 'unreasonable and deficient appellate performance.'" *Freeman v. Lane,* 962 F.2d 1252 (7th Cir.1992). However, where, as here, the exchange was brief and was not referred to again during the trial, the Indiana Supreme Court found that the

comment was harmless error, and thus insufficient to constitute deficient performance. 702 N.E.2d at 1074. This court agrees with the assessment of the Indiana Supreme Court that the violation was harmless error, and thus the failure to raise it was not deficient performance under the *Strickland* standard.

## D. Failure to Raise Wood Video Issue

■ Rodney Wood, Miller's co-defendant, pled guilty and testified at trial against Miller. After that testimony, and after several other witnesses had testified for the prosecution, the state put on Wood's videotaped confession, taped shortly after his arrest a few days after the murder. Trial counsel objected to the tape's admission and publication because it violated Miler's right to confront and cross-examine Wood, it violated the best evidence rule, it was cumulative, and the resulting prejudice far outweighed the probative value of the statement. 702 N.E.2d at 1070. The trial court overruled the objection on the basis of *Fox v. State,* 520 N.E.2d 429 (Ind.1988). In *Fox,* a videotaped confession was presented to the jury after the witness's credibility had been seriously attacked on cross-examination and his plea bargain discussed at length. 520 N.E.2d at 432. Additionally, the trial court only permitted excised portions of the tape to be played. *Id.* Here, Miller argues, the entire tape was played to the jury, even though Miller's counsel had requested that only an excised portion of the tape be played, and even though Miller's counsel had not significantly attacked Wood's plea agreement.

The Indiana Supreme Court, reviewing this issue after post-conviction relief proceedings, found that Miller's claim was substantially similar to that in *Fox.* 702 N.E.2d at 1071. Miller's trial counsel did vigorously cross-examine Wood and in-

quired into his plea agreement. *Id.* Additionally, Wood was in custody and could have been recalled if Miller had wanted to cross-examine him about the videotape. *Id.* Thus, the court found that the failure of appellate counsel to raise this issue on appeal was not deficient performance. *Id.*

The admission of the Wood videotape was a matter of state law, and the failure of Miller's appellate counsel to raise the issue does not fall outside the bounds of professional conduct. Although this court has not been provided with this tape, it appears from the opinions of the Indiana Supreme Court both on direct appeal and on PCR appeal that the videotape significantly tracks the testimony of Wood on the stand during the state's case-in-chief. While such might be cumulative, this court finds that the decision of the Indiana Supreme Court that Miller's appellate counsel's failure to raise the issue was not deficient is not an unreasonable application of the facts in this case to the standards of *Strickland.* Therefore, no relief is appropriate under 28 U.S.C. § 2254.

As appellate counsel, like trial counsel, did not fall below the norms of performance in his representation of Miller, Miller has not satisfied the first prong of the *Strickland* test on this claim. Thus, this court need not reach the issue of prejudice caused by such deficient performance. This court will not issue a writ of habeas corpus on this ground.

## V. Conclusion

This court must note that during the proceedings held before the court in Lafayette, Indiana on March 16, 2000, counsel for this petitioner attempted to assert either factual or actual innocence on behalf of this petitioner under *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), a claim which was not addressed in any of the papers submitted to this court. With all due respect, an examination of the factual state court and appellate records here leads this court to the conclusion that the evidence of this petitioner's guilt is, to say the least, overwhelming. This court is entitled to consider as correct the facts found as reflected in the two opinions by the Supreme Court of Indiana under 28 U.S.C. § 2254(e)(1). Additionally, this court has made an independent examination of the underlying trial record in both the trial on the merits and the post-conviction proceedings have also been made, and that corroborates and sustains the conclusions made by the Supreme Court of Indiana.

The record in this case discloses that this petitioner orchestrated the activities of two petty teenage thieves into a highly brutal, real-life version of *Deliverance.* He is thus no less subject to the imposition of the death penalty than Gregory Resnover was in the shoot-out resulting in the killing of an Indianapolis police officer.[12] As the evidence more than supports the conclusion that the Indiana Supreme Court reasonably applied the standards of *Strick-*

**12.** *See Resnover v. State,* 460 N.E.2d 922 (Ind. 1984), *cert. denied, Resnover v. Indiana,* 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984), *Resnover v. State,* 547 N.E.2d 814 (Ind.1989) (denying post-conviction relief), *cert denied, Resnover v. Indiana,* 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 175 (1990) *Resnover v. Pearson,* 754 F.Supp. 1374 (N.D.Ind. 1991) (denying habeas relief), *aff'd,* 965 F.2d 1453 (7th Cir.1992), *cert. denied,* 508 U.S. 962, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993), and *Smith v. State,* 465 N.E.2d 1105 (Ind. 1984), *Smith v. State,* 613 N.E.2d 412 (Ind.1993)(denying post-conviction relief), *cert. denied, Smith v. Indiana,* 511 U.S. 1063, 114 S.Ct. 1634, 128 L.Ed.2d 357 (1994), *Smith v. Farley,* 873 F.Supp. 1199 (N.D.Ind.1994)(denying habeas relief), *aff'd,* 59 F.3d 659 (7th Cir.1995), *cert. denied, Smith v. Parke,* 516 U.S. 1123, 116 S.Ct. 935, 133 L.Ed.2d 861 (1996).

*land v. Washington,* in reviewing the performance of counsel in this case, this court cannot find a violation of 28 U.S.C. § 2254. Thus, the petition for writ of habeas corpus is now **DENIED.**

**IT IS SO ORDERED.**